UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------x

GRAY MONTAGUE; JONAH DOE;
JAKE DOE; JOSH DOE; and RON DOE,

          Plaintiffs,                                         **COMPLAINT**

          —against—                                **Case No.:**

POLY PREP COUNTRY DAY SCHOOL; WILLIAM      **PLAINTIFFS DEMAND**
M. WILLIAMS; and RALPH DUPEE,                   **A TRIAL BY JURY**

          Defendants.

--------------------------------------------------------------------------x

       Plaintiffs, by and through their attorneys, Kevin T. Mulhearn, P.C. and Darren J. Epstein,

Esq., P.C., complaining of the Defendants, hereby allege that:

**OVERVIEW**

1.      Founded in 1854, Poly Prep Country Day School ("POLY PREP") is a college preparatory

school located in Brooklyn, New York.

2.      POLY PREP's Mission Statement quotes former Headmaster, Joseph Dana Allen: "The

school aims to develop mentality, physique, and character, but because the first of these are

menaces without the last, the greatest of these is character."

3.      From 1966 to 1991, POLY PREP and some of its high-ranking administrators and officials

fell woefully short of POLY PREP's own high "character" mandate by engaging in a conspiracy

to conceal and cover up the prolonged and horrific sexual abuse of many of its sons by POLY

PREP's late renowned football coach, Philip Foglietta ("Foglietta").

4.      POLY PREP's calculated and pernicious multi-decade coverup of sexual abuse permitted

Foglietta to sexually abuse each of the Plaintiffs *many years* after POLY PREP and its high-

ranking administrators and officials had received ***actual knowledge***, from ***multiple sources***, that:

(1) Foglietta was a rapacious sexual predator; (2) Foglietta had a propensity to sexually abuse minor boys; and (3) Foglietta had previously sexually abused many Poly Prep students (all minor boys) at POLY PREP beginning in 1966, his very first year as an employee of the school.

5.      This action is brought by five (5) men who were sexually abused at POLY PREP during their childhoods and have suffered from the lingering and devastating consequences of that abuse for decades.

6.      In 2009, twelve (12) former Poly Prep students filed a lawsuit in this Court and claimed, *inter alia*, that POLY PREP had violated Title IX, 20 U.S.C. § 1681(a) (1972), by acting with deliberate indifference to its actual knowledge of Foglietta's sexual misconduct.  Many of the notice allegations alleged in that case, *Zimmerman v. Poly Prep Country Day School* ("*Zimmerman*"), Case No. 09-CV-4586 (FB) (CLP), are likewise contained in this Complaint.

7.      Many of the allegations in this Complaint were gleaned from the deposition testimony of Defendant WILLIAMS (who was deposed on June 30, 2010) and other POLY PREP staff members or administrators, as well as documents produced by POLY PREP in the *Zimmerman* case.

8.      Plaintiffs, JONAH DOE, JAKE DOE, JOSH DOE, and RON DOE are proceeding in this case under pseudonyms in order to protect their anonymity.  As victims of sexual abuse, each such Plaintiff is entitled to maintain his anonymity to preserve his privacy and to prevent any stigma and/or other negative ramifications that would occur if his identity were publicly disclosed.

9.      Plaintiff's counsel has (or soon hereafter will) confidentially identified each Plaintiff to POLY PREP's counsel.  Upon information and belief, with the consent of the Defendants, the parties will submit a proposed Protective/Confidentiality Order to the Court that will preserve the

anonymity of these Plaintiffs throughout this litigation.

10.     Such consent has routinely been received and such orders have been granted in numerous actions—including one in this Court involving POLY PREP as a defendant—filed since the amended statute of limitations for childhood sexual abuse actions, N.Y. CPLR § 214-g (the "New York Child Victims Act"), went into effect.

## JURISDICTION AND VENUE

11.     This Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1331 insofar as Count I raises claims under Title IX of the Education Amendments of 1972, Publ. L. No. 92-318, 86 Stat. 235, 373 (codified as amended at 20 U.S.C.§§ 1681-1688 (1994)).

12.     This Court has supplemental jurisdiction over Plaintiffs' claims under New York State law, pursuant to 28 U.S.C. § 1367, in that said state claims are inextricably intertwined with the federal claims in this action.  Indeed, the state law claims are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

13.     *In the alternative*, this Court has exclusive jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), based upon diversity of citizenship in that: Plaintiff GRAY MONTAGUE is a citizen of and is domiciled in the State of Pennsylvania; Plaintiff JONAH DOE is a citizen of and is domiciled in the State of Virginia; Plaintiff JAKE DOE is a citizen of and is domiciled in the State of California; Plaintiff JOSH DOE is a citizen of and is domiciled in the State of Florida; Defendant POLY PREP is a citizen of, regularly conducts business in, and maintains its offices in the State of New York; Defendant WILLIAM M. WILLIAMS is a citizen of and is domiciled in the State of Vermont; and Defendant RALPH DUPEE is a citizen of and is domiciled in the State

of New York; and each Plaintiff claims damages in excess of the sum of $75,000.00.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the events or omissions forming the bases of these claims occurred in this District.

## PARTIES

15.     Plaintiff, GRAY MONTAGUE ("MONTAGUE"), is an adult individual residing in the State of Pennsylvania.   He attended POLY PREP from 1976 (7th grade) through his graduation in 1981.

16.     Plaintiff, JONAH DOE, is an adult individual residing in the State of Virginia.  He attended POLY PREP from 1980 (7th grade) through his graduation in 1986.

17.     Plaintiff, JAKE DOE, is an adult individual residing in the State of California.  He attended POLY PREP from 1977 (9th grade) through his graduation in 1981.

18.     Plaintiff, JOSH DOE, is an adult individual residing in the State of Florida.   He attended POLY PREP from 1974 (5th grade) through the end of his sophomore year (in 1980).

19.     Plaintiff, RON DOE, is an adult individual residing in the State of Colorado.   He attended POLY PREP from 1973 (7th grade) through his graduation in 1979.

20.     Defendant, POLY PREP, is, and at all material times has been, a college preparatory school located in Brooklyn, New York.  At all material times, various students attended POLY PREP from 5th Grade through 12th Grade.

21.     At various times, moreover, from 1970 to present, various children attended POLY PREP's summer camp programs and activities, which are conducted on POLY PREP grounds during the summer months (when school is not in session).  Many POLY PREP faculty members, teachers, and coaches (including Foglietta) worked at the Poly Prep camps.

4

22.     Defendant, WILLIAM M. WILLIAMS ("WILLIAMS"), is an adult individual residing in the State of Vermont.

23.     WILLIAMS was employed as Headmaster of POLY PREP from 1970 through 2000.  At all such times, WILLIAMS was responsible for the training, supervision, and disciplining of Foglietta, and acted in the course of his employment as an agent, servant, and/or employee of Defendant POLY PREP.

24.     Defendant, RALPH DUPEE ("DUPEE"), is an adult individual residing in the State of New York.

25.     DUPEE, upon information and belief, was a high-ranking administrator at POLY PREP (including, upon information and belief, stints as Dean of Boys and Business Manager), from 1961 to 1998.

26.     From about 1966 to 1991, DUPEE acted in the course of his employment as an agent, employee, and/or servant, of Defendant POLY PREP.

27.     MICHAEL NOVELLO is an adult individual residing in the State of Florida.

28.     NOVELLO, upon information and belief, was a high-ranking administrator at POLY PREP (including, upon information and belief, stints as Head of the Middle School and Dean of Boys), from 1970 to 1991.

29.     From about 1970 to 1991, NOVELLO acted in the course of his employment as an agent, employee, and/or servant, of Defendant POLY PREP.

5

## GENERAL ALLEGATIONS

30.     In the late 1950s and early 1960s, Philip Foglietta ("Foglietta") worked as an assistant football coach at St. Francis Preparatory High School ("St. Francis Prep"), which was then located in Brooklyn, New York.

31.     Upon information and belief, in the early 1960s, St. Francis Prep fired Foglietta for sexual misconduct with minor boys.

32.     Upon information and belief, in or about 1965, Foglietta was a close friend of Harlow Parker ("Parker"), POLY PREP's Athletic Director, and implored Parker to help him get a coaching and teaching job at POLY PREP.  This was difficult because POLY PREP's policies and practices at the time required all instructors, including physical education instructors, to have obtained a four-year college degree.  Foglietta had worked for the U.S. Army as a young man but did not have any college degree.

33.     Upon information and belief, in or about 1965 or 1966, Parker highly recommended Foglietta for a coaching and physical education instructor position, and implored those with hiring authority at POLY PREP to bypass the school's college degree requirement for Foglietta.

34.     In 1966, POLY PREP hired Philip Foglietta as a football coach and physical education instructor for students in the 5th grade through 12th grade.  Foglietta worked at POLY PREP in that capacity from 1966 through 1991.

35.     Philip Foglietta died in January, 1998.

## FOGLIETTA'S PROLIFIC SEXUAL ABUSE OF MINOR BOYS AT POLY PREP

36.     Upon information and belief, from 1966 through 1991, Foglietta sexually abused more than a hundred boys, many on or near the premises of POLY PREP.  Upon information and belief, often under the guise of athletic mentor, Foglietta abused boys in an age range of 9-years-old to 17-years-old.

37.     Foglietta had a particular sick and depraved sexual attraction to young boys with blonde hair and blue eyes and, upon information and belief, sexually abused dozens of boys with those physical characteristics.  His grooming and exploitation of young boys with blonde hair and blue eyes was open and notorious at POLY PREP (and, at all material times, was known and readily apparent to numerous POLY PREP officials, administrators, faculty members, and students), as Foglietta was often surrounded by young boys with those characteristics who were too young to be involved in any of POLY PREP's athletic programs or teams.

38.     In 1966, Foglietta became assistant football coach at POLY PREP.  Shortly thereafter, he was hired as the Head Coach of the Poly Prep Varsity Football Team (and remained in that position until his "retirement" from the school in 1991).

39.     Upon information and belief, Foglietta often recruited vulnerable boys to work as managers of the football team.  To fulfill their myriad duties, these managers were required to spend considerable time alone with Foglietta.

40.     Upon information and belief, from 1970 through 1991, Foglietta exploited his special access to and control and authority over his football team managers to sexually abuse many of them.

41.     Upon information and belief, from 1966 through 1991, Foglietta sexually abused numerous students in every POLY PREP graduating class.

42.     By way of limited example, Foglietta, upon information and belief, sexually abused at least six (6) students from the Class of 1979, at least seven (7) students from the Class of 1980, at least eight (8) students from the Class of 1981, at least seven (7) students from the Class of 1982, at least six (6) students from the Class of 1983, at least seven (7) students from the Class of 1984, at least five (5) students from the Class of 1985, and at least six (6) students from the Class of 1986.

43.     Upon information and belief, Foglietta also sexually abused numerous minor boys who attended Poly Prep's Summer Day Camp, from 1966 through 1991.

44.     For many of those years, Foglietta worked as a counselor at that camp, which was organized, coordinated, and supervised by POLY PREP officials.

## FOGLIETTA'S SEXUAL ABUSE OF THE PLAINTIFFS

### GRAY MONTAGUE

45.     In 1975, GRAY MONTAGUE enrolled as a 7th grade student at POLY PREP.

46.     MONTAGUE was a handsome boy with blonde hair and blue eyes and he quickly became the object of Foglietta's depraved desires.

47.     Foglietta frequently remarked that MONTAGUE resembled the movie star, Troy Donohue, and Foglietta regularly referred to MONTAGUE as "Donohue."

48.     Foglietta's sexual abuse of MONTAGUE, in violation of Article 130 of the New York Penal Law, occurred between the years of 1975 and 1979.

49.     Foglietta sexually abused MONTAGUE more than twenty (20) times over a four-year period (1975 through 1979).

8

50.     Foglietta's sexual abuse of MONTAGUE included but was not limited to: (1) Foglietta's touching and fondling of MONTAGUE's buttocks and genitals; (2) Foglietta's preforming oral sex on MONTAGUE; and (3) on several occasions, Foglietta's anal rape of MONTAGUE.

51.     Foglietta's sexual abuse of Plaintiff occurred at various locations on the grounds of POLY PREP, including but not limited to: (1) Foglietta's "Cage" office in the bowels of the Boys' Locker Room; (2) the Boys' Locker Room; (3) POLY PREP's shower room; (4) POLY PREP's gymnasium building; and (5) in Foglietta's green Chevrolet Impala automobile (which was parked on or adjacent to POLY PREP grounds).

52.     In or about 1979, during MONTAGUE's junior year at POLY PREP, Foglietta took MONTAGUE to his mother's apartment in Bay Ridge and sexually abused him.  During this encounter, MONTAGUE hit Foglietta on the head and told him, in words or substance, "this has to stop."  Foglietta never sexually abused MONTAGUE again after that incident.

53.     When MONTAGUE entered POLY PREP he played football, basketball, and baseball. Foglietta coached each of these sports and used his position of authority over MONTAGUE to take advantage of him and make his life miserable.

54.     MONTAGUE complained to NOVELLO and Defendants DUPEE and WILLIAMS about Foglietta's sexual abuse in or about 1976 or 1977, 1977 or 1978, and 1979 or 1980.

55.     Each POLY PREP administrator reacted to MONTAGUE's complaints with hostility and derision and threatened to expel MONTAGUE if he persisted with his complaints against Foglietta.

56.     Foglietta's sexual abuse of MONTAGUE was motivated by Foglietta's need and perverse intent to gratify his own sexual desires.

57.     Foglietta's sexual abuse of MONTAGUE, and the POLY PREP Defendants' deliberate and reckless indifference to it, had a profound and negative impact on MONTAGUE's life.

58.     As a direct and proximate result of Foglietta's sexual abuse, and the POLY PREP Defendants' misconduct, MONTAGUE suffered severe physical injuries, and suffered, and continues to suffer, from severe emotional anguish and mental pain and suffering.

59.     In or about 1976 or 1977, when in 8th grade, MONTAGUE first attempted to take his own life.

60.     He subsequently tried to commit suicide on two other occasions.

61.     Beginning in 1979, MONTAGUE began to abuse alcohol and drugs, and he has battled alcohol and drug addictions his entire life, since he was sexually abused as a child at POLY PREP.

62.     MONTAGUE committed numerous crimes, including several DWI violations, in the throes of his alcohol and drug addictions, and has spent a substantial part of his life in and out of alcohol and drug abuse rehabilitation facilities, since he was sexually abused as a child at POLY PREP.

63.     Foglietta's sexual abuse made MONTAGUE feel unclean, worthless, and "like a loser." He has battled severe depression, low self-esteem, and struggled with his sexual identity, for his entire life, since he was sexually abused as a child at POLY PREP.

64.     Foglietta's sexual abuse of MONTAGUE, and the POLY PREP Defendants' misconduct, directly and proximately caused him to struggle to maintain close and intimate personal relationships with women, as he has great difficulty in trusting people and maintaining intimacy.

65.     He was married once but is now divorced.  He has an adult son.

66.     Foglietta's sexual abuse of MONTAGUE, and the POLY PREP Defendants' misconduct, directly and proximately caused him to have great difficulty in maintaining and retaining

10

employment commensurate with his skills and aptitude.  He has much difficulty in accepting authority, and is prone to anger and rage.  His lifetime earnings are substantially less than they would have been but for Foglietta's sexual abuse.

67.    MONTAGUE's life-long battles with drug abuse and alcohol abuse have taken a significant toll on his health.  MONTAGUE suffered a heart attack in late 2020.  In early 2021, he contracted COVID-19.

**JONAH DOE**

68.    In 1980, JONAH DOE enrolled as a 7th grade student at POLY PREP.

69.    JONAH DOE was an extremely vulnerable child when he entered POLY PREP.  His parents divorced shortly after he was born and he had no day-to-day relationship with his biological father.  His step-father was an alcoholic who regularly physically assaulted JONAH DOE during his childhood.

70.    JONAH DOE attended POLY PREP on a work-study financial aid package, through which, upon information and belief, POLY PREP received federal funds and/or grants.

71.    During JONAH DOE's 9th grade year, Foglietta exploited JONAH DOE's need to participate in a federally funded work-study package to facilitate his repeated sexual abuse of JONAH DOE.  Foglietta, in fact, demanded that JONAH DOE perform his work-study duties (i.e., setting up football game films) in Foglietta's "cage" office and equipment room.  This provided Foglietta with more alone time with JONAH DOE, which Foglietta then used and exploited to repeatedly sexually abuse JONAH DOE.

72.    JONAH DOE thought POLY PREP was going to be a sanctuary from which he could escape his difficult and tumultuous home-life, and he turned to Foglietta as a counselor, teacher,

advisor, and male role model.

73.    At Foglietta's urging, JONAH DOE became an assistant manager of the POLY PREP football team and eventually worked his way to the head manager position.   JONAH DOE's position as football manager provided Foglietta with unfettered access to and control and authority over JONAH DOE throughout his tenure as a student at POLY PREP.

74.    Foglietta's sexual abuse of JONAH DOE, in violation of Article 130 of the New York Penal Law, occurred between the Spring of 1981 (when FUMAI was a 13-year-old 8th grader) and the Fall of 1985.

75.    Foglietta's sexual abuse of JONAH DOE was motivated by Foglietta's need and perverse intent to gratify his own sexual desires.

76.    Foglietta sexually abused JONAH DOE more than one hundred (100) times from 1981 through 1985.

77.    During the school year, Foglietta sexually abused JONAH DOE at least once or twice per week (on average).

78.    Foglietta's sexual abuse of JONAH DOE included but was not limited to: (1) Foglietta's touching and fondling of JONAH DOE's buttocks and genitals (often while Foglietta masturbated himself); (2) Foglietta's performing oral sex on JONAH DOE; (3) Foglietta's forcing JONAH DOE to masturbate him (Foglietta); and (4) other inappropriate conduct.

79.    Foglietta's sexual abuse of JONAH DOE occurred at various locations on the grounds of POLY PREP, including but not limited to: (1) Foglietta's "Cage" office in the bowels of the Boys' Locker Room; (2) the POLY PREP equipment room; and (3) POLY PREP's coaches' locker room.

80.     Foglietta also frequently sexually abused JONAH DOE at his (Foglietta's) apartment located at 9302 Ridge Blvd., Brooklyn, New York.

81.     In 1984, POLY PREP's Athletic Director, Harlow Parker (Foglietta's direct supervisor), walked into the POLY PREP equipment room while Foglietta was sexually abusing JONAH DOE and masturbating himself.  Parker and POLY PREP took no action in response to Parker's direct observation of Foglietta's sexual abuse of JONAH DOE.

82.     About that time, POLY PREP's Director of Physical Education, Edward Ruck, walked into the coaches' locker room and observed Foglietta showering with and inappropriately touching JONAH DOE and two other POLY PREP students.  Ruck and POLY PREP took no action in response to Ruck's direct observation of Foglietta's inappropriate touching of JONAH DOE and several other POLY PREP students.

83.     Foglietta's sexual abuse of JONAH DOE, and the POLY PREP Defendants' deliberate and reckless indifference to it, had a profound and negative impact on JONAH DOE's life.

84.     As a direct and proximate result of Foglietta's sexual abuse, and the POLY PREP Defendants' misconduct, JONAH DOE suffered severe physical injuries, and suffered, and continues to suffer, from severe emotional anguish and mental pain and suffering.

85.     In or about 2006, when Foglietta's sexual predations were publicized in the New York tabloids, JONAH DOE faced severe and crippling depression and seriously contemplated suicide. His lowest point occurred in 2011.  He had a complete breakdown at work, left his laptop and keys on his desk, and walked out of his office with the thought of taking his own life.

86.     Beginning in 1986, JONAH DOE began to abuse alcohol and drugs, and he has battled alcohol abuse his entire life, since he was sexually abused as a child at POLY PREP.

87.     JONAH DOE has suffered from severe depression and low self-esteem his entire life.  He has a strained relationship with his mother and partially blames her for the abuse he suffered as a child.

88.     Foglietta's sexual abuse of JONAH DOE and the POLY PREP Defendants' misconduct, directly and proximately caused him to struggle to maintain close and intimate personal relationships with women, as he has great difficulty in trusting people and maintaining intimacy.

89.     JONAH DOE is married and has three children.   His childhood travails have made him hyper-vigilant and over-protective with respect to his children.

90.     Foglietta's sexual abuse of JONAH DOE, and the POLY PREP Defendants' misconduct, directly and proximately caused him to underperform scholastically throughout his life.  His grades at POLY PREP were below par, and far lower than they would have been but for Foglietta's long-term sexual abuse.  JONAH DOE failed to graduate from college.

91.     Foglietta's sexual abuse of JONAH DOE, and the POLY PREP Defendants' misconduct, directly and proximately caused him to have great difficulty in maintaining and retaining employment commensurate with his skills and aptitude.  He worked for a long time in menial jobs and his lifetime earnings are substantially less than they would have been but for Foglietta's sexual abuse.

92.     Foglietta's sexual abuse of JONAH DOE, and the POLY PREP Defendants' misconduct, directly and proximately caused him to incur substantial expenses for psychological therapy, which he needs and regularly uses to attempt to deal with and reconcile his childhood trauma.

**JAKE DOE**

93.     In 1977, JAKE DOE enrolled as a 9th grade student at POLY PREP.

94.     JAKE DOE was the youngest of three children.  His father was not at all involved or interested in his extracurricular activities and never attended his athletic events.

95.     JAKE DOE attended POLY PREP on a work-study financial aid package, through which, upon information andbelief, POLY PREP received federal funds and/or grants.

96.     JAKE DOE played football all four years at POLY PREP and became known by Foglietta in his capacity as a football player.  Foglietta began to massage JAKE DOE regularly in the POLY PREP training room, but those "massages" soon turned into sexual assaults.

97.     JAKE DOE played football, basketball, and baseball his freshman year, and Foglietta coached each of those sports.  Foglietta exploited his position of authority over JAKE DOE to manipulate situations in which JAKE DOE often found himself alone with Foglietta.  When JAKE DOE struggled against Foglietta while being abused, Foglietta sternly admonished him, and told him, in words or substance, "this is what all professional athletes do.  This is normal behavior."

98.     Foglietta's sexual abuse of JAKE DOE, in violation of Article 130 of the New York Penal Law, occurred between the Fall of 1977 (when JAKE DOE was a 14-year-old 9th grader) and 1979.

99.     Foglietta sexually abused JAKE DOE at least twenty-five (25) times from 1977 through 1979.

100.    During JAKE DOE's first two school years at POLY PREP, Foglietta sexually abused JAKE DOE between 12 to 20 times per year.

15

101.    Foglietta's sexual abuse of JAKE DOE was motivated by Foglietta's need and perverse intent to gratify his own sexual desires.

102.    Foglietta's sexual abuse of JAKE DOE included but was not limited to: (1) Foglietta's touching and fondling of JAKE DOE's buttocks and genitals; and (2) Foglietta's rubbing his naked body on JAKE DOE's body.

103.    Foglietta's sexual abuse of JAKE DOE occurred at various locations on the grounds of POLY PREP, including but not limited to: (1) a large training room that was directly across from JAKE DOE's locker; (2) a smaller training room (where uniforms were stored and folded); (3) the POLY PREP squash courts; and (4) the POLY PREP fieldhouse.

104.    Foglietta also once sexually abused JAKE DOE at his (Foglietta's) apartment located at 9302 Ridge Blvd., Brooklyn, New York, after taking JAKE DOE and several other POLY PREP students to a movie (ironically entitled, "The Jerk").

105.    In or about 1978, POLY PREP's equipment manager, an African-American man named "Willy", walked into the POLY PREP training room while Foglietta was sexually abusing JAKE DOE. Willy reacted in a non-plussed manner, which surprised and confused JAKE DOE.

106.    Foglietta's sexual abuse of JAKE DOE, and the POLY PREP Defendants' deliberate and reckless indifference to it, had a profound and negative impact on JAKE DOE's life.

107.    As a direct and proximate result of Foglietta's sexual abuse, and the POLY PREP Defendants' misconduct, JAKE DOE suffered severe physical injuries, and suffered, and continues to suffer, from severe emotional anguish and mental pain and suffering.

108.    JAKE DOE has battled severe depression and low self-esteem his entire life, since he was sexually abused as a child at POLY PREP.  He has great difficulty in maintaining relationships.

16

His experience at POLY PREP makes it difficult for him to trust people or maintain close, interpersonal relationships. He also has great difficulty with intimacy and disdains talking about himself or his past.

109.    Except for a brief marriage in 1999, JAKE DOE continues to struggle with close relationships. He appreciates and is fond of children and believes that he was gifted with natural parental instincts. (He has coached a high school lacrosse team and volunteered as a Coach for the Special Olympics for the past 15 years.). Unfortunately, as a result of the deep impact of his POLY PREP trauma, JAKE DOE was denied the opportunity to have children or a family.

110.    Foglietta's sexual abuse of JAKE DOE, and the POLY PREP Defendants' misconduct, directly and proximately caused him to underperform scholastically throughout his life. Not surprisingly, while at POLY PREP, JAKE DOE struggled to concentrate on his school work and thus found himself near the bottom of his class scholastically. When he left POLY PREP (and Foglietta), JAKE DOE was finally able to focus on school and he excelled academically—gaining admission to a top medical school.

111.    While attending medical school, JAKE DOE unfortunately ran into a janitor that closely resembled Philip Foglietta. That chance encounter had a profoundly negative impact on JAKE DOE, as he once again struggled with the memory of the abuse he had endured while at POLY PREP and found it difficult to concentrate on his work. Shortly after that encounter, JAKE DOE dropped out of medical school.

112.    Foglietta's sexual abuse of JAKE DOE, and the POLY PREP Defendants' misconduct, directly and proximately caused JAKE DOE to have great difficulty in maintaining and retaining employment commensurate with his skills and aptitude. His lifetime earnings are substantially

less than they would have been but for Foglietta's sexual abuse.  JAKE DOE also deeply regrets that he was never able to fulfill his lifelong dream of practicing medicine.

**JOSH DOE**

113.    In 1974, JOSH DOE enrolled as a 5th grade student at POLY PREP.

114.    JOSH DOE's older brother was a highly successful student-athlete at POLY PREP.

115.    Foglietta's sexual abuse of JOSH DOE, in violation of Article 130 of the New York Penal Law, occurred between the years of 1976 and 1979.

116.    Foglietta sexually abused JOSH DOE more than one hundred (100) times over a four-year period (1976 through 1979).

117.    Foglietta's sexual abuse of JOSH DOE was motivated by Foglietta's need and perverse intent to gratify his own sexual desires.

118.    Foglietta's sexual abuse of JOSH DOE included but was not limited to: (1) Foglietta's touching and fondling of JOSH DOE's buttocks and genitals; and (2) Foglietta's masturbating of JOSH DOE.

119.    Foglietta's sexual abuse of JOSH DOE occurred at various locations on the grounds of POLY PREP, including but not limited to: (1) Foglietta's "Cage" office in the bowels of the Boys' Locker Room; (2) POLY PREP's squash courts; (3) POLY PREP's training room; and (4) POLY PREP's wrestling room.

120.    JOSH DOE played basketball at POLY PREP in his freshman year, and was coached by Foglietta.

121.    Foglietta's sexual abuse of JOSH DOE began in 1976 when, during a physical education class in POLY PREP's gymnasium (during basketball practice), Foglietta brazenly placed his hand

18

down the front of JOSH DOE's shorts and touched his penis.

122.    Foglietta often had other POLY PREP teachers and coaches, including Robert Morrison and Eric Harrison, pull JOSH DOE out of class and direct him to "visit" Foglietta in his "Cage" office.  Foglietta would then sexually abuse JOSH DOE.

123.    JOSH DOE's grades at POLY PREP were extremely low, in large part because of Foglietta's ongoing sexual abuse.  JOSH DOE believes that Foglietta and POLY PREP cheated him out of a good education.

124.    During JOSH DOE's 7th grade and 8th grade years, Foglietta regularly sexually abused JOSH DOE at least once or twice a week during the school year.

125.    Foglietta's sexual abuse of JOSH DOE lessened in frequency during his 9th grade year (1978 to 1979), and stopped altogether during the first half of JOSH DOE's 10th grade year (in 1979), after JOSH DOE rebuffed Foglietta's attempt to sexually abuse him in his "Cage" office.

126.    After his 10th grade year, POLY PREP expelled JOSH DOE for deficient grades.  He completed high school in Staten Island, New York several years later.

127.    Foglietta's sexual abuse of JOSH DOE, and the POLY PREP Defendants' deliberate and reckless indifference to it, had a profound and negative impact on JOSH DOE's life.

128.    As a direct and proximate result of Foglietta's sexual abuse, and the POLY PREP Defendants' misconduct, JOSH DOE suffered severe physical injuries, and suffered, and continues to suffer, from severe emotional anguish and mental pain and suffering.

129.    Beginning in 1979, JOSH DOE began to abuse alcohol and drugs, and he has battled alcohol and drug abuse his entire life, since he was sexually abused as a child at POLY PREP.

130.    Foglietta's sexual abuse made JOSH DOE feel like the "black sheep" of his family.  He has battled severe depression and low self-esteem for his entire life, since he was sexually abused as a child at POLY PREP.

131.    Foglietta's sexual abuse of JOSH DOE, and the POLY PREP Defendants' misconduct, directly and proximately caused him to struggle to maintain close and intimate personal relationships with women, as he has great difficulty in trusting people and maintaining intimacy.

132.    In or about 2000, JOSH DOE was married, but he divorced in or about 2004.  He has an adult son.

133.    When JOSH DOE's son was about 3-years-old, JOSH DOE's wife told him, in words or substance, when he was giving his son a bath, "you don't need to put so much soap on him."

134.    That remark triggered JOSH DOE, and led directly to the dissolution of his marriage, as he interpreted her comment to be an accusation of inappropriate touching or sexual abuse of their son.

135.    Given JOSH DOE's own traumatic childhood experiences, he was unable and unwilling to forgive his wife for such an unfounded and hurtful accusation or insinuation.

136.    Foglietta's sexual abuse of JOSH DOE, and the POLY PREP Defendants' misconduct, directly and proximately caused him to have great difficulty in maintaining and retaining employment commensurate with his skills and aptitude.  He has much difficulty in accepting authority, and does not follow directions well.  His lifetime wages—earned in large part as a laborer—are substantially less than they would have been but for Foglietta's sexual abuse.

137.    JOSH DOE has battled significant health problems, and recently suffered a heart attack.

**RON DOE**

138.    In 1975, RON DOE was enrolled as a 9th grade student at POLY PREP.

139.    Foglietta's sexual abuse of RON DOE, in violation of Article 130 of the New York Penal Law, occurred throughout his freshman year (1975-1976).

140.    Foglietta sexually abused RON DOE more than thirty (30) times over a one-year period (1975 through 1976).

141.    Foglietta's sexual abuse of RON DOE was motivated by Foglietta's need and perverse intent to gratify his own sexual desires.

142.    Foglietta's sexual abuse of RON DOE included but was not limited to: (1) Foglietta's touching and fondling of RON DOE's buttocks and genitals; and (2) Foglietta's masturbating of RON DOE.

143.    Foglietta's sexual abuse of RON DOE occurred at various locations on the grounds of POLY PREP, including but not limited to: (1) a room located across from the Girls' Locker Room (on the First Floor); (2) POLY PREP's squash courts; (3) POLY PREP's training room; and (4) POLY PREP's gymnasium.

144.    Foglietta also sexually abused RON DOE one time in his apartment in Bay Ridge.

145.    RON DOE played basketball at POLY PREP in his freshman year, and was coached by Foglietta.

146.    Foglietta's sexual abuse of RON DOE stopped altogether RON DOE's 10th grade year (in 1976), after RON DOE aggressively rebuffed Foglietta's attempt to sexually abuse him.

147.    Foglietta's sexual abuse of RON DOE, and the POLY PREP Defendants' deliberate and reckless indifference to it, had a profound and negative impact on RON DOE's life.

148.    When Foglietta was sexually abusing RON DOE, RON DOE would strenuously attempt to disassociate his mind from Foglietta's actions, in an effort to prevent himself from having an orgasm.

149.    As a direct and proximate result of Foglietta's sexual abuse, and the POLY PREP Defendants' acts and omissions, RON DOE has suffered from Male Anorgasmia for most of his life.  Male Anorgasmia is a serious medical condition whereby a man has a persistent inability to have an orgasm, even after sexual stimulation.  RON DOE's Male Anorgasmia has caused substantial damage to every single romantic or sexual relationship that RON DOE has ever had with a woman (including his wives), and has caused RON DOE himself to suffer extreme mental anguish, emotional distress, and mental pain and suffering.

150.    As a direct and proximate result of Foglietta's sexual abuse, and the POLY PREP Defendants' misconduct, RON DOE suffered severe physical injuries, and suffered, and continues to suffer, from severe emotional anguish and mental pain and suffering.

151.    For many years, RON DOE suffered from (and continues to suffer from) severe depression and anxiety, as well as sleeping disorders, and has been prescribed various medications to treat those conditions.  At numerous times, as a result of his childhood trauma, RON DOE seriously entertained thoughts of suicide.

152.    Beginning in 1976, RON DOE began to abuse alcohol and drugs, and he has battled alcohol and drug abuse his entire life, since he was sexually abused as a child at POLY PREP.  RON DOE has sought and received various treatments for his alcohol and drug abuse, and has managed to maintain his sobriety for a number of years.   RON DOE has discussed his sexual abuse as a child by Foglietta with numerous mental health providers and therapists for many years.

153.    Foglietta's sexual abuse of RON DOE, and the POLY PREP Defendants' misconduct, directly and proximately caused him to struggle to maintain close and intimate personal relationships with women, as he has great difficulty in trusting people and maintaining intimacy.

154.    In or about 1989, RON DOE was married, but he divorced his first wife in or about 2005. He has several adult children.  RON DOE has since remarried.

155.    Foglietta's sexual abuse of RON DOE, and the POLY PREP Defendants' misconduct, has directly and proximately caused RON DOE to struggle with a level of sexual dysfunction throughout his entire life.

## HIGH-RANKING POLY PREP ADMINISTRATORS AND OFFICIALS HAD A PLETHORA OF ACTUAL NOTICE OF FOGLIETTA'S SEXUAL ABUSE OF BOYS

156.    Upon information and belief, beginning in 1966 and throughout his tenure at the school (until 1991), POLY PREP and its high-ranking administrators and officials had actual and constructive knowledge of Foglietta's sexual abuse of numerous minor boys at or near POLY PREP, but condoned and facilitated Foglietta's criminal behavior because he was a highly successful football coach and instrumental in raising substantial revenue for the school.

157.    POLY PREP, indeed, derived substantial revenue, from alumni donations, tuition payments, and otherwise, from the unparalleled success of its football program and resulting overall athletic scholarship programs, during Foglietta's reign, as well as the general sterling reputation of the school.

158.    Upon information and belief, on multiple occasions, from 1966 through 1991, numerous individuals came forward to POLY PREP's administrators, officials and/or faculty members and complained about Foglietta's sexual abuse of children, including numerous POLY PREP students

and family members of students.

159.    Moreover, upon information and belief, from 1966 to 1991, numerous POLY PREP administrators, officials, and faculty members *personally observed* Foglietta sexually abusing minor boys at POLY PREP.

160.    On each such occasion, POLY PREP and its administrators, officials, and faculty members, engaged in a deliberate and criminal cover-up and concealment of Foglietta's criminal and emotionally devastating conduct.

161.    Upon information and belief, from 1966 through 1991, Foglietta committed numerous violations of Article 130 of the New York State Penal Law with respect to the sexual abuse of children, including each of the Plaintiffs.

162.    At all material times, the POLY PREP Defendants not only had actual knowledge that Foglietta had violated, and was continuing to violate, numerous state and federal criminal statutes with respect to the sexual abuse of children, but conspired to conceal and cover up each of those criminal violations.

## ALLEGATIONS OF WILLIAM JACKSON

163.    In 1966, William Jackson ("JACKSON"), a plaintiff in the *Zimmerman* case, was attending POLY PREP as, upon information and belief, a 13-year-old eighth grader.

164.    At that time, POLY PREP was investigating several incidents which involved the sexual abuse of younger students by older students.

165.    In 1966, POLY PREP assigned Foglietta to assist in that investigation.  During Foglietta's interviews of JACKSON, Foglietta repeatedly asked JACKSON a series of highly inappropriate and offensive sexually-related questions.  Later, on multiple occasions, in 1966, Foglietta sexually

24

abused JACKSON.

166.    JACKSON then notified his parents, David Jackson and Jean Jackson, of the abuse he suffered from Foglietta, and JACKSON's parents arranged for JACKSON to tell his story of abuse to POLY PREP during a meeting with JACKSON, his parents, POLY PREP's then Headmaster, J. Folwell Scull, and POLY PREP's Athletic Director, Harlow Parker.

167.    JACKSON notified Headmaster Scull and Mr. Parker in graphic and explicit detail as to the nature and extent of Foglietta's sexual abuse, and upon information and belief, Mr. Scull reviewed the matter with POLY PREP's then Board of Trustees.

168.    At that point, POLY PREP, Headmaster Scull, Harlow Parker, and its Board of Trustees, proceeded to take the first known action to conceal and cover-up the sexual abuse of a student by Foglietta.

169.    Tragically, to the immeasurable detriment of each of the Plaintiffs and dozens, if not hundreds, of other Foglietta victims, this conspiracy of silence would continue for more than forty years.

170.    Indeed, upon being presented with detailed and credible evidence of Foglietta's sexual abuse of a child, POLY PREP, Headmaster Scull, Athletic Director Harlow Parker, and the POLY PREP Board of Trustees, proceeded to conduct a sham investigation and then falsely notified JACKSON and his parents that they had conducted a complete and thorough investigation, that JACKSON's allegations against Foglietta were not credible, that JACKSON was required to cease and desist from making any further allegations of this nature against Foglietta, and that JACKSON would face severe consequences if he persisted in accusing Foglietta of sexual misconduct.

171.    In 1967, Foglietta continued to engage in inappropriate and sexually charged conduct against JACKSON, and JACKSON again complained to Headmaster Scull about Foglietta's conduct.  Headmaster Scull then informed JACKSON that his charges were not credible, and that JACKSON was required to cease and desist from making any further allegations of this nature against Foglietta, and that JACKSON would face severe consequences, including expulsion, if he persisted in accusing Foglietta of sexual misconduct.

172.    Upon information and belief, had POLY PREP, Headmaster Scull, Harlow Parker, and POLY PREP's Board of Trustees conducted a credible, real and legitimate investigation of JACKSON's allegations against Foglietta, rather than a mere sham investigation designed to conceal and cover-up Foglietta's criminal behavior, they would have uncovered a multitude of corroborating evidence to support JACKSON's sexual abuse claims.

173.    Indeed, upon information and belief, a number of other POLY PREP students who were interviewed by Foglietta about the sexual abuse of younger students by older students were sexually abused by Foglietta in much the same manner as how he abused JACKSON.

174.    The aforesaid acts of  POLY PREP, and its administrators, in 1966 were the first overt acts in furtherance of a self-concealing fraud and coverup, in which POLY PREP: (1) passed off Foglietta to students, parents, alumni, and other persons, as a dedicated and righteous coach and physical education instructor and provided him with unfettered access to and authority over a myriad of unsuspecting and innocent boys, even though POLY PREP, and its high-ranking administrators, had actual and constructive knowledge that Foglietta was an abuser of children, and a pedophile, who should not have been permitted to go anywhere near young children; and (2) dismissed WILLIAM JACKSON's complaint against Foglietta as unfounded, even though POLY

PREP and its high-ranking administrators had actual and constructive knowledge that the sexual abuse accusations made by WILLIAM JACKSON against Foglietta were entirely truthful and credible.

### "ANONYMOUS" COMPLAINTS ABOUT FOGLIETTA IN THE EARLY 1970s

175.    In 1970, Defendant WILLIAMS replaced J. Folwell Scull as POLY PREP Headmaster. Defendant WILLIAMS served as POLY PREP's Headmaster from 1970 through 2000.

176.    Upon information and belief, J. Folwell Scull and/or the POLY PREP Board of Trustees notified WILLIAMS of the complaints made by WILLIAM JACKSON and/or others to the effect that Foglietta had sexually abused students at POLY PREP.

177.    In or about May, 2002,  POLY PREP was contacted by a lawyer for David Hiltbrand ("HILTBRAND"), Class of 1971, a former POLY PREP student (and a Plaintiff in the *Zimmerman* case) who, in February 1991, had sent a letter to Defendant WILLIAMS notifying him that Foglietta had sexually abused him (HILTBRAND) when he was a POLY PREP student in 1966.

178.    Inexplicably, Defendant WILLIAMS discarded that letter, but a copy was of that letter was provided to POLY PREP (in 2002) by David Hiltbrand's attorney.

179.    In May, 2002, Poly Prep's Board of Trustees directed William M. Williams to draft a memorandum which outlined his response to David Hiltbrand's February 20, 1991 letter which accused Foglietta of sexually abusing him.

180.    Thereafter, on or about May 27, 2002, Defendant WILLIAMS drafted and forwarded to David Harman, Robert Herrmann, Esq. (POLY PREP's counsel) and the POLY PREP Board of Trustees, a handwritten memorandum, which provided in pertinent part that:

*At no time before or after David's letter have I ever received a letter, or been told directly, from*

*an alumnus or former student of Poly, that he had been assaulted by Phillip Foglietta.  The only awareness during the 20 years prior to 1991 came from an unsigned letter from a parent accusing Coach Foglietta of **molesting students**.  I showed the letter to him and he, of course, denied the allegation.  Knowing that I could not fire for cause a much-revered and respected coach without substantiation and a witness who would stand behind his accusation in court if necessary, I told Coach Foglietta I would not act on an unsigned letter, but if I ever received reliable evidence of such a criminal breach of trust, I would fire him. (Emphasis added).*

181.    Upon information and belief, the phrase "molesting students" had a clear and categorical sexual abuse connotation.

182.    However, upon information and belief, POLY PREP, POLY PREP's Board of Trustees, and/or POLY PREP's counsel, Robert F. Herrmann, Esq., conspired to erase the sexual abuse connotation from Mr. Williams' May 27, 2002 letter.

183.    Accordingly, upon information and belief, Mr. Williams was instructed by the Board of Trustees to rewrite his memorandum to strike the phrase "molesting students" and replace it with "abusing of students."

184.    So, on June 6, 2002, Mr. Williams drafted and delivered to David Harman, Robert F. Herrmann, Esq., and the Board of Trustees another handwritten memorandum, which provided in pertinent part that:

*At no time before or after David Hiltbrand's letter of February 20, 1991, I have I ever [sic] been informed by an alumnus or former student that he or she had been abused by Coach Foglietta. The only reports I had received during my 20 years at Poly prior to David's letter were two unsigned letters from parents (possibly the same one) who reported that that [sic] **children had been abused** by Coach Foglietta.  I showed one of the letters to Coach Foglietta and he denied the accusation.  Knowing that I could not fire for cause a much-revered and respected coach without substantiation and a witness, I told Coach Foglietta I would not act at that time, but if I received, at any time, proof of such a criminal breach of trust, I would indeed fire him.* 
*(Emphasis added).*

185.    Upon information and belief, the POLY PREP Board of Trustees was aware, in late May and early June, 2002, that at least two (2) letters had been sent to Defendant WILLIAMS which

28

accused Foglietta of sexual misconduct.  Accordingly, upon information and belief, at the direction of the Board, Defendant WILLIAMS revised his memorandum to include two (2) alleged anonymous letters against Foglietta, instead of one (1).

186.    Upon information and belief, in the early 1970s Defendant WILLIAMS confronted Foglietta about at least one letter which accused him (Foglietta) of sexually molesting students.

187.    Upon information and belief, Foglietta angrily denied the charge and threatened to file a defamation lawsuit against POLY PREP if it published or disseminated the allegations of sexual misconduct.

188.    In the early 1970s, Defendant WILLIAMS also received at least one phone call from a woman who accused Foglietta of doing "terrible things" to POLY PREP students.

189.    Defendants POLY PREP and WILLIAMS failed to retain any copies, or the originals, of the above-referenced letters, and failed to memorialize in any way both these letters and phone call(s), even though said letters and/or documentation of said events would have potentially corroborated any additional allegations of sexual misconduct against Foglietta (who, upon information and belief,  had threatened to sue POLY PREP for defamation).

### POLY PREP PERMITTED FOGLIETTA TO INTERFERE WITH HIS STUDENT VICTIMS' EDUCATIONS

190.    Upon information and belief, in the 1970s and 1980s, Foglietta was so brazen and aggressive in his sick sexual pursuit of minor boys at POLY PREP that he often forced his preferred boys to miss classes, or pulled them out of classes that they were attending, in order to be subjected to sexual abuse by Foglietta.

191.    Upon information and belief, on many occasions, one or more of Foglietta's victims was contacted by Athletic Director Harlow Parker and/or Headmaster WILLIAMS, with respect to both their unexcused absences from classes and their failing grades.

192.    Upon information and belief, in response, on many occasions, Foglietta contacted Parker and/or WILLIAMS and told them, in words or substance, to stop harassing the subject[s] of his abuse.  Regularly, both Parker and WILLIAMS cow-towed to Foglietta's demands and failed and refused to punish Foglietta's victims[s] appropriately, or remediate in any way, their chronic absences from classes (often occurring while Foglietta was abusing said boy[s]), and their failing academic performance[s].

193.    POLY PREP, therefore, most notably though WILLIAMS and Parker, at the behest of Foglietta, sabotaged and destroyed the academic career[s] and education of [several of] Foglietta's victim[s].

## ALLEGATIONS OF JOHN MARINO

194.    In the mid-1970s John Marino (Class of 1976) was a student at POLY PREP and a member of POLY PREP's varsity football team.

195.    During John Marino's freshman year at POLY PREP (1972), Foglietta attempted to sexually abuse John Marino but was rebuffed.

196.    Thereafter, Foglietta began a vicious campaign of physical, verbal and emotional abuse against John Marino.  On multiple occasions, often under the auspices of football demonstrations, Foglietta physically assaulted John Marino.  On numerous occasions Foglietta openly and publicly verbally abused John Marino.   During said demonstrations, Foglietta frequently called him insulting names, for example, "a ratfink pussy" or "the most undisciplined faggot he (Foglietta)

had ever met." This campaign of harassment did not end until John Marino graduated from POLY PREP in 1976.

197.    On multiple occasions, i.e., at least ten times, John Marino saw Foglietta sexually abusing boys on or near the POLY PREP grounds, including on POLY PREP facilities and on Seventh Avenue (in Foglietta's green Chevy Impala).

198.    On one occasion, when John Marino's father (John Anthony Marino) came to POLY PREP to pick up his son from school, both John Marino and his father, John Anthony Marino, actually witnessed Foglietta sexually abusing a child.

199.    In or about 1973 (John Marino's sophomore year at POLY PREP), John Marino's parents, John Anthony Marino and Phyliss Marino, met at POLY PREP with Defendant WILLIAMS and Harlow Parker, POLY PREP's Director of Athletics and Foglietta's direct supervisor.

200.    At that meeting, John Marino's parents told Defendant WILLIAMS and Harlow Parker that their son had told them that Foglietta was sexually abusing boys on or near POLY PREP grounds, but Defendant WILLIAMS and Harlow Parker told John Marino's parents that their son had started a false and malicious rumor about Foglietta's sexual abuse of children, and that John Marino was undisciplined and a trouble-maker.

201.    Defendant WILLIAMS and Harlow Parker then threatened to expel John Marino from POLY PREP for his alleged misbehavior, which included John Marino's continued allegations that Foglietta was sexually abusing children.

31

202.   According to Phyllis Marino:

*"At one point after this meeting, John told me about an incident with Foglietta in one of the changing rooms.  He said that Foglietta had been massaging John's leg and went beyond that to his 'privates.'  My husband complained to the school about this but they denied it, didn't do anything about it, and said that 'kids exaggerate things.'  My husband confronted Foglietta directly but he denied everything."*

203.   In or about 1974 (John Marino's junior year at POLY PREP), John Marino's parents, John Anthony Marino and Phyliss Marino, again met at POLY PREP with Defendant WILLIAMS and Harlow Parker,  POLY PREP's Director of Athletics and Foglietta's direct supervisor.

204.   At that meeting, John Marino's parents again told Defendant WILLIAMS and Harlow Parker that their son had told them that Foglietta was sexually abusing boys on or near POLY PREP grounds, but Defendant WILLIAMS and Harlow Parker again denied these allegations and told John Marino's parents that their son had started a false and malicious rumor about Foglietta's sexual abuse of children, and that John Marino was undisciplined, a trouble-maker, and "on thin ice."

205.   Defendant WILLIAMS and Harlow Parker again threatened to expel John Marino from POLY PREP for his alleged misbehavior, which included John Marino's continued allegations that Foglietta was sexually abusing children.

206.   In the early and mid-1970s, John Marino's father, John Anthony Marino, was, upon information and belief, a worker for the New York City Parks Department.  In that capacity, Mr. Marino knew Mr. Foglietta and Mr. Parker well from the sandlot ball fields of Brooklyn.

207.   Mr. Marino told his son, John Marino, that on several occasions in the mid-1970s he had communications with Harlow Parker outside of POLY PREP in which he (Mr. Marino) explicitly expressed concern about Foglietta's propensity to sexually abuse minor boys.  On each said

occasion, according to Mr. Marino, Mr. Parker told him, in words or substance, to leave the issue alone.

208.    Upon information and belief, in 1973 or 1974, or both, Defendant WILLIAMS told a high-ranking POLY PREP administrator, Michael Novello, about the allegations of John Marino, and John Marino's father, to the effect that they had observed Foglietta sexually abusing minor boys on or near POLY PREP grounds.

209.    Upon information and belief, Defendants POLY PREP and WILLIAMS failed to memorialize any of the allegations of John Marino, and/or his parents, against Foglietta, even though said allegations corroborated WILLIAM JACKSON's earlier allegations, and would have potentially corroborated any additional allegations of sexual misconduct against Foglietta (which would have been needed if Foglietta followed through on his threat to sue POLY PREP for defamation).

210.    Upon information and belief, as far back as the early 1970s, POLY PREP and Defendant WILLIAMS made the conscious and fateful decision to whitewash Foglietta's egregious sexual misconduct, and the incalculable harm inflicted by Foglietta upon scores of children entrusted to POLY PREP's care and supervision, rather than to protect its students (including each Plaintiff) or even to protect itself from any legal actions which may have been commenced by Foglietta had he suffered any adverse employment actions as a result of his sexual abuse of children (which he did, eventually, when he was fired in 1991).

211.    Upon information and belief, in the mid-1970s, *after* POLY PREP had received numerous complaints from independent sources which alleged that Foglietta had sexually abused various children, POLY PREP moved Foglietta's office into a wire cage office located in the bowels of

33

the Boys' Locker Room, where POLY PREP was unable to provide any supervision whatsoever of Foglietta, and which provided Foglietta with easier and fuller access to vulnerable and unsuspecting boys.  This action was the equivalent of throwing a lighted match into a stack of hay.

212.    For more than fifteen years, Foglietta abused numerous minor boys (including Plaintiffs), in his locker room office, which was notoriously referred to as "the Cage" by POLY PREP students.

### ALLEGATIONS OF "JOHN DOE II"

213.    In 1968, "JOHN DOE II" (a pseudonym) (a plaintiff in the *Zimmerman* case) began attending POLY PREP as, upon information and belief, a fifth grade student.

214.    JOHN DOE II left POLY PREP in 1974 (during his sophomore year).

215.    On one occasion, in or about 1972, Poly Prep's Athletic Director, Harlow Parker, directly observed JOHN DOE II being sexually abused by Foglietta in the boys' showers.

216.    Nonetheless, Mr. Parker left the shower area without saying a word to either Foglietta or JOHN DOE II and, upon information and belief, POLY PREP and Parker took no further action with respect to Parker's direct observance of Foglietta's sexual abuse of JOHN DOE II.

217.    In or around 1972 or 1973, JOHN DOE II, told a POLY PREP administrator, Robert Foreman, the Head of the Lower School, that Foglietta was inappropriately "grabbing" boys.  No action was taken by Mr. Foreman or any other POLY PREP administrator in response to JOHN DOE II's complaint to Mr. Foreman.

218.    At some time in the mid-1970s, Defendant WILLIAMS was notified by several students that Mr. Foreman had inappropriately touched several boys.

34

219.    Rather than fire Mr. Foreman, Defendant WILLIAMS paid Mr. Foreman for a year for not showing up for work, allowed his contract to expire after that paid year of no work, and did not inform any students, alumni, or law enforcement authorities of the specific sexual misconduct complaints against Mr. Foreman.

220.    Upon information and belief, POLY PREP's and Defendant WILLIAMS' "handling" of the Foreman matter, allowed Mr. Foreman to continue to work as an educator, where he continued to have access to and control and authority over scores of minor children.

### ALLEGATIONS OF "JOHN DOE III"

221.    On one occasion, in or about 1971, while at Foglietta's Bay Ridge apartment, "JOHN DOE III" (a pseudonym) (a plaintiff in the *Zimmerman* case) opened a dresser drawer in Foglietta's bedroom and saw that the drawer was filled with photographs of naked boys.  This drawer contained hundreds of photographs which seemed to have been taken inside Foglietta's apartment with a Kodak Instamatic camera.

222.    Upon information and belief, a number of these photographs depicted POLY PREP students.

223.    On several occasions, Foglietta tried to take compromising and indecent photographs of JOHN DOE III.

### ALLEGATIONS OF "MARK DOE"

224.    In or about the Summer of 1972, "MARK DOE" (a pseudonym), then approximately 12-years-old, attended Poly Prep Day Camp at POLY PREP.  Foglietta, who worked as a counselor at the camp, repeatedly sexually abused MARK DOE at POLY PREP during camp sessions.

225.    On one occasion, in or about August, 1972, MARK DOE directly notified Defendant RALPH DUPEE, in his office at POLY PREP, that Foglietta had been inappropriately touching him during camp.

226.    MARK DOE conveyed to DUPEE, a high-ranking POLY PREP administrator, in words or substance, that Foglietta was sexually abusing him.

227.    DUPEE reacted angrily to MARK DOE's complaint against Foglietta, and told him in words or substance that "he should keep his mouth shut" if he knew what was good for him.

228.    Upon information and belief, DUPEE and POLY PREP took no further action in response to MARK DOE's allegations against Foglietta.

## ALLEGATIONS OF "PC-41 DOE"

229.    A man designated as "PC-41 DOE" has filed a lawsuit in this Court against POLY PREP, WILLIAM M. WILLIAMS, and MICHAEL NOVELLO (Case No. 1:20-cv-03628-DG-SJB), in which he alleges that Foglietta sexually abused him at POLY PREP from approximately 1976 through 1983.

230.    PC-41 DOE alleges in his Complaint that "[i]n approximately 1979-80, [he] told a POLY PREP homeroom and music teacher, . . . Mr. Michael Morangelli, about Foglietta's inappropriate conduct. . . [and] was told that Foglietta's behavior would be looked into."  (Doc. No. 1 at paras. 61-62).

231.    Upon information and belief, Morangelli and POLY PREP took no further action in response to PC-41 DOE's allegations against Foglietta.

36

## THE VEY-WILLIAMS CONFRONTATION

232.     In the 1970s and 1980s, J. Forest Vey, worked as a shop teacher at POLY PREP.  Two of Mr. Vey's sons had attended POLY PREP and, upon information and belief, both graduated from POLY PREP prior to 1976.

233.     Upon information and belief, in December, 1976, prior to POLY PREP's Chapel service to celebrate the upcoming Christmas vacation, Mr. Vey stormed into Defendant WILLIAMS' office at POLY PREP and confronted him about Foglietta's sexual abuse of POLY PREP students.

234.     Upon information and belief, Mr. Vey shouted at Defendant WILLIAMS, in words or substance, "You need to get rid of that fucking pervert!"

235.     Upon information and belief, Defendant WILLIAMS shouted back to Mr. Very, in words or substance, "I can't do that.  My hands are tied."

## ALLEGATIONS OF "JOHN DOE V"

236.     On one occasion, in or about 1974, Foglietta took "JOHN DOE V" (a pseudonym) (a plaintiff in the *Zimmerman* case), a 12-year-old camper at Poly Prep Day Camp, into a classroom during the day (when camp was in session) and proceeded to sexually abuse him.

237.     When  JOHN DOE V was naked from the waist down and being sexually abused by Foglietta, a POLY PREP faculty member entered the classroom, observed what was going on, said, in words or substance, "oh, you're in here," and left the room.  That faculty member and POLY PREP took no further action.

## THE THREE COMPLAINTS OF GRAY MONTAGUE

238.     In or about 1976, Defendant DUPEE was still, upon information and belief a high-ranking administrator at POLY PREP.

239.    In or about 1976 or 1977, GRAY MONTAGUE, then 13-years-old and in 8th grade, told Defendant DUPEE, in general terms, that Foglietta was inappropriately touching him and making him "uncomfortable."  Defendant DUPEE then told MONTAGUE that he "was in trouble," and, upon information and belief, DUPEE and POLY PREP took no further action in response to MONTAGUE's complaint against Foglietta.

240.    In or about 1977 or 1978, MICHAEL NOVELLO was, upon information and belief a high-ranking administrator at Poly Prep.

241.    In or about 1977 or 1978, Plaintiff MONTAGUE, then 14-years-old and in 9th grade, informed NOVELLO, directly and unequivocally, that Foglietta was sexually abusing him during, shortly before, or shortly after, his team's athletic practices.

242.    Despite being made aware (by Defendant WILLIAMS) that in 1973 and 1974 John Marino had complained to Defendant WILLIAMS and Mr. Parker that Foglietta was sexually abusing boys at POLY PREP, NOVELLO told MONTAGUE, in words or substance: "Bullshit, no one on our staff would ever do anything like that."

243.    NOVELLO further told MONTAGUE, in words and substance, that: "You are not the brightest guy in school.  If you persist in your allegations, we will expel you."

244.    Upon information and belief, NOVELLO and POLY PREP took no further action in response to MONTAGUE's complaints about Foglietta's sexual assaults.

245.    NOVELLO, moreover, did not notify any parents, students, alumni, or law enforcement authorities, about GRAY MONTAGUE's specific and direct sexual abuse allegation against Foglietta, and Foglietta thereafter continued to sexually abuse MONTAGUE, JONAH DOE, JAKE DOE, and JOSH DOE (as well as scores of other children).

246.    In or about 1979 or 1980, Plaintiff MONTAGUE, then 16-years-old and in 11th grade, informed Defendant WILLIAMS that Foglietta had sexually abused him at POLY PREP.

247.    Defendant WILLIAMS reacted angrily to MONTAGUE's complaint about Foglietta, and threatened to expel him if he persisted with his allegations against Foglietta.

248.    Upon information and belief, Defendant WILLIAMS and POLY PREP took no further action in response to MONTAGUE's complaint about Foglietta's sexual assaults.

249.    Defendant WILLIAMS, and POLY PREP, moreover, did not notify any parents, students, alumni, or law enforcement authorities, about GRAY MONTAGUE's sexual abuse allegations against Foglietta, and Foglietta thereafter continued to sexually abuse JONAH DOE, JAKE DOE, and JOSH DOE (as well as scores of other children).

### ALLEGATIONS OF JONAH DOE

250.    In or about 1984, POLY PREP's Athletic Director, Harlow Parker, directly observed Foglietta sexually abusing JONAH DOE, then a 15-year-old sophomore in high school.

251.    Harlow Parker could not have mistaken Foglietta's conduct with JONAH DOE for anything other than what it was: a blatant, unequivocal sexual assault of a minor child.

252.    Parker walked into the equipment room while JONAH DOE, then about 15-years-old, was lying naked on a table. Foglietta was rubbing JONAH DOE's naked buttocks with one hand, while masturbating himself with the other.  Parker directly observed this full range of criminal activity but he and POLY PREP took no action to stop the assault, punish Foglietta, or protect JONAH DOE as well as other POLY PREP students.

253.    On another occasion, on a Saturday afternoon, Edward Ruck, POLY PREP's Director of Physical Education, walked near the showers in POLY PREP's coaches locker room and observed

Foglietta showering with and inappropriately touching JONAH DOE and two other POLY PREP students.  Ruck and POLY PREP, upon information and belief, took no further action in response to his direct observance of Foglietta's inappropriate touching of and showering with JONAH DOE and several other POLY PREP students.

### POLY PREP'S COVERUP AND SPOLIATION OF EVIDENCE

254.    In furtherance of its coverup of Foglietta's sexual abuse of POLY PREP students, POLY PREP, and/or its employees or agents, deliberately destroyed or discarded the following documents: (1) the letters received in the early 1970s by Defendant WILLIAMS which accused Foglietta of sexual misconduct; (2) the original letter of David Hiltbrand, dated February 20, 1991, to Defendant WILLIAMS, which specifically and directly accused Foglietta of sexually abusing David Hiltbrand and other students; (3) a letter stuffed in various faculty mailboxes in 1990/1991, given to Defendant WILLIAMS by Sharyn Dolan (a POLY PREP faculty member), which directly accused Foglietta of sexually abusing students; and (4) all copies and/or the originals of the investigative notes of Peter T. Sheridan, Esq., an attorney hired by POLY PREP in 2002 to investigate, *inter alia*, the knowledge of POLY PREP's administrators and faculty as to Foglietta's sexual abuse of minor children and students at POLY PREP.

255.    Likewise, in furtherance of its coverup of Foglietta's sexual abuse of POLY PREP students, POLY PREP, and/or its employees or agents, deliberately destroyed or discarded the following documents, or failed to generate or produce any documents pertaining to the following events: (1) POLY PREP's investigation of, and/or response to, WILLIAM JACKSON's 1966 allegations of sexual misconduct by Foglietta; (2) POLY PREP's investigation of, and/or response to, various letters and/or phone calls (received in the 1970s) which accused Foglietta of sexual misconduct

and other inappropriate conduct; (3) POLY PREP's investigation of, and/or response to, John Marino's 1973 and 1974 allegations of sexual misconduct by Foglietta; (4) POLY PREP's investigation of, and/or response to, J. Forest Vey's accusations of sexual misconduct against Foglietta; (5) POLY PREP's investigation of, and/or response to, GRAY MONTAGUE's multiple sexual abuse allegations against Foglietta; (6) POLY PREP's investigation of, and/or response to Athletic Director  Harlow Parker's personal observances of Foglietta sexually abusing two POLY PREP students (in 1972 and 1984); (7) all minutes, audiotape recordings, or other documents created or generated by POLY PREP's Board of Trustees (or the Board of Trustees' Subcommittee on Sexual Misconduct) in 2002 during its so-called "investigation" of allegations of sexual abuse by Foglietta; and (8) all documents created or generated by Peter Sheridan, Esq., Roderick MacLeish, Esq., Jeffrey Newman, Esq., and/or Greenberg Traurig, LLP, in connection with their investigation or review of sexual abuse allegations at or concerning POLY PREP, from 2002 to present.

## POLY PREP'S PATENTLY FALSE NARRATIVE AS TO THE CAUSE OF FOGLIETTA'S TERMINATION OF EMPLOYMENT

256.    In *Zimmerman*, various POLY PREP officials stated and testified that in 1991, POLY PREP had terminated Foglietta's employment by the school based upon Headmaster WILLIAMS' receipt of a letter from David Hiltbrand, a Poly Prep alumnus (and Plaintiff in the *Zimmerman* case), dated February 20, 1991, in which HILTBRAND informed Defendant WILLIAMS that he had been sexually abused by Foglietta at POLY PREP in 1966 (when HILTBRAND had been a student at POLY PREP).

257.    On or about February 20, 1991, HILTBRAND wrote Defendant WILLIAMS and informed

him that HILTBRAND had been sexually abused by Foglietta while he (HILTBRAND) had been

a student at POLY PREP.   Said letter stated, in pertinent part, that:

> *I do not know if Foglietta is still on your faculty.  I don't even*
> *know if he is still alive.  Although . . .  I have no fond feelings*
> *for Poly, I have no wish to drag the school's reputation through*
> *the mud.  The impression I have of you is a man of probity.  I*
> *trust that you will recognize the gravity of the situation . . . and*
> *will deal with it appropriately both for my sake and for that of*
> *the other Poly students who might have suffered in silence.*

258.    Defendant WILLIAMS failed and refused to extend HILTBRAND the simple courtesy of

responding to HILTBRAND's letter, so HILTBRAND repeatedly left WILLIAMS telephone

messages, none of which were returned.

259.    Finally, after weeks of trying to reach WILLIAMS, HILTBRAND telephoned WILLIAMS

and WILLIAMS answered the call. WILLIAMS told HILTBRAND that WILLIAMS had failed

to respond to HILTBRAND's letter which alleged that Foglietta had sexually abused him because

he (WILLIAMS) had hurt his hand while skiing.

260.    In the *Zimmerman* case, Defendant WILLIAMS (and several other POLY PREP officials)

testified that in 1991, after he received HILTBRAND's letter, WILLIAMS convened a meeting in

his office with Harlow Parker, Director of Athletics, Edward Ruck, Director of Physical Education,

and several other POLY PREP athletic department staff members who had attended the school in

the early 1970s, to attempt to ascertain if anyone knew anything about Foglietta's alleged sexual

abuse of POLY PREP students.

261.    Upon information and belief, such group meeting never took place, and Defendant

WILLIAMS (and other POLY PREP officials and/or employees) manufactured this ***termination-***

*of-Foglietta-in-response-to-the-Hiltbrand-letter* story from whole cloth to advance their defense in the *Zimmerman* case.

262.    The prior testimony of Defendant WILLIAMS as to an alleged group meeting that he convened to discuss HILTBRAND's February 1991 letter and Foglietta's alleged sexual misconduct is patently and demonstrably false, in that, *inter alia*: (1) Harlow Parker had retired from Poly Prep in 1987 (four years prior to the phantom group meeting); and (2) Edward Ruck, the Director of Athletics in 1991 and thus Foglietta's direct supervisor, testified in his June 14, 2011 deposition that he had no recollection of any group meeting to discuss HILTBRAND's letter, and WILLIAMS *never* asked him whether he had any knowledge as to whether Foglietta had ever sexually molested any POLY PREP students.

263.    At his deposition, Defendant WILLIAMS also testified that after POLY PREP decided to fire Foglietta for sexual abuse at the end of the Spring 1991 Term, POLY PREP and WILLIAMS instructed Harlow Parker and Edward Ruck to safeguard POLY PREP students present on campus in April and May, 1991, by monitoring Foglietta's actions to the greatest extent possible.

264.    This testimony, likewise, was patently and demonstrably false, in that, *inter alia*: (1) Harlow Parker, in 1991, had been retired from Poly Prep for four years; and (2) Edward Ruck testified  that he had no recollection of being instructed by WILLIAMS to "monitor" Foglietta in any way during Foglietta's last few months as an employee of POLY PREP.

265.    Upon information and belief, POLY PREP and Defendant WILLIAMS took no action whatsoever in response to David Hiltbrand's February 20, 1991 letter, and consistent with his actions after receiving other letters that accused Foglietta of sexual misconduct (including at least two such letters in the early 1970s and another accusatory letter in 1991), WILLIAMS cravenly

discarded Hiltbrand's letter with the hope and expectation that the issue of Foglietta's numerous sexual assaults of POLY PREP students would never be publicly revealed by anyone.

266.    Upon information and belief, in Spring 1991, a then-current POLY PREP student ("AL DOE") (a pseudonym), told "JOEL DOE" (a pseudonym), a POLY PREP football coach (who, upon information and belief, while a student at POLY PREP in the early 1970s, had himself been subjected to an attempted sexual assault by Foglietta), that Foglietta had repeatedly sexually abused him.

267.    Upon information and belief, JOEL DOE promptly told Defendant WILLIAMS about AL DOE's allegations but WILLIAMS and POLY PREP took no immediate action against Foglietta.

268.    Upon information and belief, thereafter, JOEL DOE told a number of other POLY PREP coaches about AL DOE's abuse allegations, and these coaches, including Bart Moroney and Harold Bernieri, had several discussions amongst themselves about how to best protect POLY PREP students from Foglietta's sexual predations.

269.    Upon information and belief, one or more of these coaches implored Defendant WILLIAMS, and/or other POLY PREP administrators and/or trustees, to immediately terminate Foglietta's employment.   POLY PREP, however, did not take any immediate action to fire Foglietta, even after AL DOE's complaint to JOEL DOE, and JOEL DOE's transmission of that complaint to Defendant WILLIAMS.

270.    Upon information and belief, in Spring 1991, AL DOE then told his parents that Foglietta had sexually abused him at POLY PREP, and his parents promptly contacted POLY PREP and Defendant WILLIAMS, insisted that POLY PREP fire Foglietta, and threatened public and/or media exposure of Foglietta and POLY PREP if the school continued to retain Foglietta on staff.

271.    Upon information and belief, only then did POLY PREP and Defendant WILLIAMS fire Foglietta for sexual misconduct.

272.    Upon information and belief, David Hiltbrand's February 20, 1991 letter to Defendant WILLIAMS, which was discarded by WILLIAMS and *not* shared or discussed by WILLIAMS with other POLY PREP administrators and faculty members, had absolutely nothing to do with POLY PREP's termination of Foglietta.

273.    POLY PREP, nevertheless, permitted Foglietta to remain as an employee, and retain access to and authority over scores of children, for numerous weeks prior to the end of the 1991 Spring Term.

274.    POLY PREP and Defendant WILLIAMS failed to monitor Foglietta during this interregnum and provided no warning to POLY PREP students or their parents (or former students) about Foglietta's known propensity to sexually abuse minor boys.

275.    To the contrary, upon Foglietta's "retirement," POLY PREP feted Foglietta with a lavish retirement dinner—that was attended by scores of alumni—at the Downtown Athletic Center in New York City.  Defendant WILLIAMS himself gave the invocation at this retirement celebration.

276.    At this dinner, numerous POLY PREP administrators, faculty members, and alumni sang the praises of Philip Foglietta, a known (yet unpunished) serial child rapist and abuser.

277.    Upon information and belief, AL DOE left POLY PREP after the Spring 1991 Term.  He graduated from another high school several years later.

## POLY PREP'S DELIBERATE INDIFFERENCE TO FOGLIETTA'S SEXUAL ABUSE OF POLY PREP STUDENTS HAD DEADLY CONSEQUENCES

278.    Mental health professionals have long recognized that the sexual abuse of a child is often not merely an unfortunate, isolated incident in the life of the victim, but a profound, soul-shattering event that casts a wide and dark shadow over various facets of his life.  One noted psychiatrist described in stark detail how the sexual abuse of a child results in his "psychic and spiritual annihilation."  (*See* Leonard Shengold, M.D., *Soul Murder: The Effects of Childhood Abuse and Deprivation* (1991)).

279.    Upon information and belief, many victims of childhood sexual abuse are so devastated by their assaults that they commit, or attempt to commit, suicide.

280.    Philip Foglietta's 25-year reign of terror (and POLY PREP's deliberate and reckless indifference to his gross misconduct) has left much carnage in its wake.

281.    Upon information and belief, at least five (5) former POLY PREP students, who attended POLY PREP in the 1970s and/or 1980s and were sexually abused by Foglietta, committed suicide.

282.    All five Plaintiffs in this action were so traumatized by Foglietta's sexual abuse that they seriously entertained thoughts of suicide at various times.

283.    In or about 2006, when Foglietta's sexual abuse first received substantial publicity in the New York tabloids, JONAH DOE fell into a severe depression to such an extent that he had great difficulty in merely getting out of bed.  He wanted to die and seriously contemplated various ways in which he could kill himself.

284.    In or about 1977 or 1978, when GRAY MONTAGUE was in 8th grade, and after he had been raped by Foglietta, MONTAGUE attempted to hang himself with a bathrobe belt in a

bathroom in his home.  That suicide attempt failed only because the ceiling fixture on which he placed his makeshift noose was not strong enough to hold his weight.

285.   MONTAGUE's two subsequent suicide attempts (one by attempted drug overdose, the other by pushing his arm through a plate-glass window) also failed.

286.   It is only by sheer luck and the grace of God that all five Plaintiffs are still alive to assert their claims in this action.

## COUNT I:  VIOLATION OF TITLE IX
## AGAINST DEFENDANT POLY PREP

287.   Plaintiffs hereby repeat and reallege each and every allegation contained in the above paragraphs of the Complaint as if each has been fully set forth at length herein.

288.   Title IX, 20 U.S.C. § 1681 (a) (1972), provides in pertinent part that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

271.   Title IX regulates private schools which choose to receive federal funding.

289.   Title IX provides a private cause of action against a recipient of federal funds for discrimination based on sex, sexual harassment, and sexual abuse.

273.   Indeed, a single sexual assault (which each Plaintiff in this case suffered) constitutes severe and objectively offensive sexual harassment for Title IX purposes.

274.   POLY PREP, upon information and belief, was at all material times a recipient of Federal financial assistance, and thus subject to Title IX, for three distinct reasons: (1) at all material times, POLY PREP's students (including Plaintiffs JONAH DOE and JAKE DOE) received federal financial aid; (2) at all material times, POLY PREP has been exempt from paying federal taxes (i.e., was a tax exempt entity), and an exemption from federal taxes produced the same result as a

47

direct federal grant (POLY PREP  possessed funds that otherwise would have belonged to the Government); and (3) POLY PREP, at various times, from 1966 to present, upon information and belief, received federal loans and other federal financial assistance for various construction and/or rehabilitation projects, or other remedial purposes.

275.     Upon information and belief, in or about April, 2020, POLY PREP received a Paycheck Protection Program ("PPP") loan from the federal government (SBA) in the amount of $5.83 Million ($5,830,290.00) as and for COVID-19 relief.  Upon information and belief, POLY PREP will not have to return any such tendered federal funds to the federal government.

276.     At all material times, moreover, POLY PREP's financial aid program was inextricably intertwined with its athletic programs, as it was used, *inter alia*, as a vehicle to provide *de facto* athletic scholarships to students, including those students targeted specifically by Foglietta and/or POLY PREP for participation in its athletic programs, and/or those students and children targeted by Foglietta for his sexual predations.

277.     Defendant POLY PREP is liable to Plaintiffs under Title IX because, at all material times, and through numerous high-ranking officials and administrators, it was deliberately indifferent to multiple known acts of discrimination (i.e., Foglietta's sexual assaults of minor boys), which occurred under its control (including on its premises and in its facilities, during school hours, and during its normal hours of operation of its athletic programs and activities).

278.     Indeed, POLY PREP's deliberate indifference both directly caused the abuse to occur and made male students, including each of the Plaintiffs, vulnerable to such abuse, and that abuse did occur and took place in a context subject to the school's control.

279.    At all material times, for the reasons set forth herein, numerous high-ranking officials and administrators of POLY PREP who had authority to institute corrective measures on the school's behalf (such as Headmaster Williams, Athletic Director Parker, Headmaster Scull, Dupee, Novello, and Ruck) had actual notice of, and were deliberately indifferent to, Foglietta's sexual misconduct.

280.    POLY PREP and its high-ranking officials and administrators, as stated above, had actual knowledge of a substantial risk of serious harm to male students, such as Plaintiffs, in a context where multiple prior allegations of sexual abuse were lodged against Foglietta prior to each Plaintiff's sexual abuse by Foglietta, and Foglietta's proclivities for sexual abuse of children, and his actual sexual abuse of children (including POLY PREP male students), were well known to POLY PREP officials and administrators, and actually personally witnessed by one of Foglietta's direct superiors (Athletic Director Parker) on several occasions.

281.    At all material times, Foglietta targeted, discriminated against, sexually harassed, and sexually abused Plaintiffs because they were boys, and POLY PREP's administrators had actual knowledge that Foglietta was discriminating against, sexually harassing, and sexually abusing children because they were boys.

282.    POLY PREP's response to Foglietta's known discrimination constitutes deliberate indifference and was clearly unreasonable in light of all of the known circumstances.

283.    As a direct and proximate result of POLY PREP's violation of Title IX, each of the Plaintiffs suffered horrendous sexual abuse and resulting life-long physical and emotional harm, as described at length herein.

284.    All of this harm—to Plaintiffs and other victims of Foglietta—was reasonably foreseeable to the Defendants at the time of their violations of Title IX.

285.    The acts and omissions of POLY PREP, particularly its violations of Title IX, demonstrated a reckless and conscious disregard of the rights, health, and safety of the rights of Plaintiffs and other victims and potential victims of Foglietta, and were so malicious, willful, and wanton, moreover, as to constitute a grievous injury to the public-at-large, as well as to the Plaintiffs.

285.    Because Congress did not provide a statute of limitations for Title IX, the most closely analogous statute of limitations under state law governs the federal cause of action. As a Title IX claim for damages is most closely analogous to a common law action for personal injury, in this case this Court should borrow and apply New York CPLR § 214 (5)'s three year statute of limitations for personal injuries.

286.    Federal law mandates that when a federal court "borrows" a state statute of limitations for application to a federal statutory claim (like Title IX), it is also required to borrow and apply the state's coordinate tolling and revival rules and exceptions, unless those rules and exceptions are inconsistent with federal law.

287.    In 2019, New York State enacted The New York Child Victims Act, N.Y. CPLR § 214-g, which revived all civil claims, including statutory claims, that involve negligent or intentional acts or omissions that arise from child sexual abuse.

288.    The New York State Legislature intended to (and did) revive any and all claims for tortious conduct, including those that fall in the middle of the spectrum of misconduct between negligence and intentional torts.  Such a reading of N.Y. CPLR § 214-g is in accord with the plain language of the statute, which states that "every civil claim or cause of action" arising from "negligent or

intentional acts or omissions" is revived.

289.    The New York Child Victims Act is not inconsistent with Title IX or any other federal law. To the contrary, the New York Child Victims Act is entirely consistent with Title IX and its intended remedial scope.

290.    Title IX sought to accomplish two objectives: first, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens with effective protection against those practices.  The application of the New York Child Victims Act to Plaintiffs' Title IX claims thus supports the goals and objectives of Title IX, as set forth by Congress.

289.    Title IX, as applied to POLY PREP's conduct and Plaintiffs' claims, provides Plaintiffs, each a victimized student, with the means of vindicating a constitutional right to be free from gender discrimination perpetrated by an educational institution.

290.    For the reasons set forth hereinabove, Plaintiffs' Title IX claims against POLY PREP were revived by The New York Child Victims Act (N.Y. CPLR § 214-g), and are thus timely.

**COUNT II:  NEGLIGENCE/GROSS NEGLIGENCE
AGAINST DEFENDANTS, POLY PREP,
WILLIAM M. WILLIAMS, and RALPH DUPEE**

291.     Plaintiffs hereby repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as if each has been fully set forth at length herein.

292.    Defendants POLY PREP, and its agents and employees, WILLIAMS and DUPEE, owed Plaintiff a duty of reasonable care to protect the Plaintiffs from injury.

293.    POLY PREP owed Plaintiffs a duty of care because it had a special relationship with each of the Plaintiffs. POLY PREP and its agents and employees were entrusted with the care and

custody of each of the Plaintiffs, and thus owed each Plaintiff an *in loco parentis* standard of care. This means that POLY PREP and its agents and employees were required to take all actions necessary to protect the Plaintiffs from any known dangers or foreseeable harm to the same extent as a reasonable parent would act with similar knowledge and under like circumstances.

294.    As a result of the high degree of vulnerability of children and the risk of sexual abuse inherent in a special relationship between a school and child, Defendant POLY PREP had a duty to establish reasonable measures of protection for children.

295.    Defendant POLY PREP also owed each Plaintiff a duty to protect him from harm because POLY PREP also had a special employer-employee and master-servant relationship with Foglietta. Especially in view of POLY PREP's actual knowledge of Foglietta's propensity to sexually abuse minor boys and his numerous sexual assaults of POLY PREP students and other minor children, POLY PREP had a duty to control Foglietta's actions at POLY PREP and protect POLY PREP students from a known danger (Foglietta).

296.    At all material times, Defendant POLY PREP was in the best position to protect its students (including each of the Plaintiffs) from the foreseeable harm presented by a known serial sexual predator, Phil Foglietta.

297.    Defendant POLY PREP owed each Plaintiff a duty of reasonable care because it solicited youths and parents for participation in its academic and athletic programs; encouraged youths and parents to have children attend POLY PREP, participate in its school programs and visit its school facilities; undertook the care and custody of minor children, including each Plaintiff; promoted its school facilities and programs as being safe for children; held out its agents and employees, including Foglietta, as safe to work and spend time with children; encouraged parents and children

to spend time with its agents and employees; and/or encouraged  its agents and employees, including Foglietta, to spend time with, interact with, recruit, educate, and indoctrinate children.

298.    By holding Foglietta out as safe to work with children, and by undertaking the custody, supervision of, and/or care of each of the minor Plaintiffs, Defendant POLY PREP entered into a fiduciary relationship with each minor Plaintiff.

299.    Indeed, each minor Plaintiff (and their parents) reposed trust and confidence in POLY PREP, WILLIAMS, and DUPEE, and each Defendant betrayed that trust and confidence by permitting Foglietta—a known sexual predator—to have unfettered access to, and control and authority over, minor children (including each Plaintiff) at POLY PREP.

300.    As a result of each Plaintiff being a minor, and by Defendants undertaking the care and guidance of these vulnerable minor Plaintiffs, Defendants held a position of empowerment over Plaintiffs.

301.    Further, Defendant POLY PREP, by holding itself out as being able to provide a safe environment for children, solicited and/or accepted this position of empowerment.  Defendant POLY PREP thus entered into a fiduciary relationship with each Plaintiff, exploited its position of empowerment, and put each Plaintiff at risk to be sexually assaulted.

302.    By accepting custody and/or supervision of each minor Plaintiff, Defendant POLY PREP established an *in loco parentis* relationship with each Plaintiff and in so doing, owed each Plaintiff a duty to protect him from injury.

303.    By establishing and/or operating POLY PREP, accepting each minor Plaintiff as a  student and participant in its school programs and/or guest of its facilities, properties, or premises, holding out its school, facilities, properties, premises, and  programs  to  be a safe environment for

Plaintiffs, accepting custody of the minor Plaintiffs *in loco parentis*, and by establishing a fiduciary relationship with each Plaintiff, Defendants POLY PREP, WILLIAMS, and DUPEE, entered into an express and/or implied duty to properly supervise each Plaintiff and provide a reasonably safe environment for all children (including Plaintiffs) who participated in their school programs and/or associated with and spent time with its football coach and physical education instructor, Foglietta.

304.   Defendants owed each Plaintiff a duty to properly supervise POLY PREP students and to prevent harm from foreseeable dangers. Defendants had the duty to exercise the same degree of care over minors under their control (including each Plaintiff) as a reasonably prudent person would have exercised under similar circumstances.

305.   Defendant POLY PREP owed each Plaintiff a duty to protect him from harm because Defendant POLY PREP invited each Plaintiff onto its properties and Foglietta posed a foreseeable dangerous condition on Defendant POLY PREP's properties.

306.   Defendants breached its duties to each Plaintiff by failing to use reasonable care. Defendants' failures include, but are not limited to: failing to properly supervise Foglietta, failing to properly supervise each Plaintiff, failing to protect each Plaintiff from a known danger (Foglietta), failing to warn Plaintiffs or their parents about a known sexual predator with a known propensity for sexually abusing minor children, failing to report Foglietta's documented and personally observed sexual misconduct and violations of the New York Penal Law to appropriate law enforcement officials, failing to conduct thorough and legitimate investigations of various sexual abuse complaints and/or allegations against Foglietta, failing to keep Foglietta away from the boys' locker rooms, training rooms, and showers, providing Foglietta with an "office" that was

far removed from the office of any other POLY PREP official, employee, coach, or supervisor, failing to terminate Foglietta's employment, failing to discipline or reproach Foglietta for his sexual misconduct, continuing to provide Foglietta with unfettered access to and authority over scores of minor children, and failing to deprive Foglietta of unfettered access to various private locations on POLY PREP grounds.

307.    For the aforesaid reasons, at all material times, the POLY PREP Defendants had a relationship with their students and children under their care, including each Plaintiff in this action, in which their students (and their parents) placed considerable trust and confidence in the POLY PREP Defendants to:  (1) act to protect them from known dangers at or related to POLY PREP; (2) warn and advise them of known dangers at or related to POLY PREP; (3) warn and advise them of criminal conduct occurring at or related to POLY PREP; (4) warn and advise them of the presence of known criminals, particularly sexual predators, who worked at POLY PREP; and (5) advise them truthfully as to the knowledge of POLY PREP and its administrators of any criminal activities, including the sexual abuse of children, which occurred at POLY PREP or involved a POLY PREP coach or teacher.

308.    As such, a fiduciary relationship existed, at all material times, between POLY PREP students and children under POLY PREP's care, including each of the Plaintiffs.

309.    Thus, at all material times, the POLY PREP Defendants owed POLY PREP students and children under POLY PREP's care, including each of the Plaintiffs, a duty to exercise the utmost good faith, honesty, and individual loyalty towards them, and to act for and give advice to them for their benefit with respect to matters within the scope of the relationship.

310.    When the POLY PREP Defendants obtained actual and constructive knowledge that Foglietta had sexually abused children (from multiple sources on numerous occasions), the POLY PREP Defendants obtained superior knowledge as to Foglietta's propensities for sexual misconduct, and thus the POLY PREP Defendants had a heightened duty, pursuant to both their superior knowledge and their aforesaid fiduciary relationship and *in loco parentis* responsibilities, to: (1) act to protect Plaintiffs and other similarly situated children from known dangers at or related to POLY PREP; (2) warn and advise them of known dangers at or related to POLY PREP; (3) warn and advise them of criminal conduct occurring at or related to POLY PREP; (4) warn and advise them of the presence of known criminals, particularly sexual predators, who worked at POLY PREP; and (5) advise them truthfully as to the knowledge of POLY PREP and its administrators of any criminal activities, including the sexual abuse of children, which occurred at POLY PREP or involved a POLY PREP coach or teacher.

311.    Each of the Plaintiffs (and their parents), at all material times, placed considerable trust in the POLY PREP Defendants, based on the latter's dominant position and control and superior knowledge of their employees' conduct, to fulfill their aforesaid responsibilities.

312.    For the aforesaid reasons, the POLY PREP Defendants breached their fiduciary duties to Plaintiffs.

313.    Defendants' conduct towards each Plaintiff constitutes gross negligence.

314.    At all material times, Defendants' acts and failures to act created an unreasonable risk of harm to minor children, including each Plaintiff, because the Defendants each failed to exercise even slight care or diligence towards Plaintiffs and other similarly situated children—and constituted gross indifference to the rights of Plaintiffs and other similarly situated children, utter

disregard of prudence, and a complete neglect of the safety of Plaintiffs and other similarly situated children.

315.    At all material times, Defendants' conduct towards each Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of each Plaintiff's rights, interests, and welfare.

316.    At all material times, Defendants' conduct towards each Plaintiff was seriously harmful to the public, which has a compelling interest in ensuring that children in the community are protected from known sexual predators and other dangerous instrumentalities.

317.    Defendants' conduct towards each Plaintiff gives rise to punitive damages.

318.    As a direct result of the foregoing, each Plaintiff sustained physical, emotional and psychological injuries, along with pain and suffering.

## COUNT III:  NEGLIGENT SUPERVISION AND TRAINING
## AGAINST DEFENDANTS, POLY PREP AND WILLIAMS

319.     Plaintiffs hereby repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as if each has been fully set forth at length herein.

320.    At all times material, Foglietta was employed by Defendant POLY PREP and was under POLY PREP's direct supervision, employ and control when he committed the wrongful acts alleged herein.

321.    Foglietta engaged in the wrongful conduct while acting in the course and scope of his employment with Defendant POLY PREP and/or accomplished the sexual abuse by virtue of his job-created authority.

57

322.     Defendant POLY PREP had a duty, arising from its employment of Foglietta, to ensure that Foglietta did not rape, sexually abuse, or molest children.

323.     Further, Defendant POLY PREP owed a duty to train and educate employees and administrators and establish adequate and effective policies and procedures calculated to detect, prevent, and address inappropriate behavior and conduct between teachers and coaches and children.

324.     Defendant POLY PREP was negligent in the training, supervision, and instruction of its employees.  Defendant POLY PREP failed to timely and properly educate, train, supervise, and/or monitor its agents or employees with regard to policies and procedures that should be followed when sexual abuse of a child is suspected or observed.

325.     Defendant POLY PREP was additionally negligent in failing to supervise, monitor, chaperone, and/or investigate Foglietta, and/or in failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to prevent Foglietta's sexual abuse of each Plaintiff.

326.     At all material times, as set forth herein, POLY PREP and its high-ranking administrators, including but not limited to WILLIAMS, NOVELLO, DUPEE, Harlow Parker, and J. Folwell Scull, had actual knowledge and constructive knowledge that Foglietta had a propensity to sexually abuse minor boys.

327.     At all material times, as set forth herein, POLY PREP and its high-ranking administrators, including but not limited to WILLIAMS, NOVELLO, DUPEE, Harlow Parker, and J. Folwell Scull, had actual knowledge and constructive knowledge that Foglietta had previously sexually abused numerous minor boys at POLY PREP.

58

328.    Indeed, on two separate occasions, spanning over a decade, Harlow Parker, POLY PREP's Athletic Director and Foglietta's direct supervisor, personally observed Foglietta sexually assaulting two different POLY PREP students in the showers at the end of the Boys' Locker Room at POLY PREP (in 1972 and 1984).

329.    In failing to properly supervise Foglietta, and in failing to establish such training procedures for employees and administrators, Defendant POLY PREP failed to exercise the degree of care that a reasonably prudent person (and parent) would have exercised under similar circumstances.

330.    Defendants, POLY PREP and WILLIAMS's, conduct towards each Plaintiff, in connection with its negligent supervision and training, constitutes gross negligence.

331.    At all material times, Defendants POLY PREP and WILLIAMS's acts and failures to act created an unreasonable risk of harm to minor children, including each Plaintiff, because POLY PREP  failed to exercise even slight care or diligence towards each Plaintiff and other similarly situated children—and constituted gross indifference to the rights of each Plaintiff and other similarly situated children, utter disregard of prudence, and a complete neglect of the safety of each Plaintiff and other similarly situated children.

332.    At all material times, Defendants, POLY PREP and WILLIAMS's, conduct towards each Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of each Plaintiff's rights, interests, and welfare.

333.    At all material times, Defendants, POLY PREP and WILLIAMS's, conduct towards each Plaintiff was seriously harmful to the public, which has a compelling interest in ensuring that children in the community are protected from known sexual predators and other dangerous

instrumentalities.

334.    Defendant POLY PREP's conduct, and Defendant WILLIAMS's conduct, towards each Plaintiff gives rise to punitive damages.

335.    As a direct and proximate result of the foregoing, each Plaintiff sustained physical, emotional and psychological injuries, along with pain and suffering.

### COUNT IV:  NEGLIGENT RETENTION AGAINST DEFENDANTS, POLY PREP AND WILLIAMS

336.    Plaintiffs hereby repeat and reallege each and every allegation contained in the above paragraphs of this Complaint as if each has been fully set forth at length herein.

337.    At all material times, Foglietta was employed by Defendant POLY PREP and was under POLY PREP's and WILLIAMS's direct supervision, employ, and control when he committed the wrongful acts alleged herein.

338.    Defendants POLY PREP and WILLIAMS became aware or should have become aware of Foglietta's propensity for sexual abuse, and failed to take any further action to remedy the problem, failed to properly investigate, failed to remove Foglietta from working with children, and failed to terminate Foglietta's employment.

339.    At all material times, as set forth herein, POLY PREP and its high-ranking administrators, including but not limited to WILLIAMS, NOVELLO, DUPEE, Harlow Parker, and J. Folwell Scull, had actual knowledge and constructive knowledge that Foglietta had a propensity to sexually abuse minor boys.

340.    At all material times, as set forth herein, POLY PREP and its high-ranking administrators, including but not limited to WILLIAMS, NOVELLO, DUPEE, Harlow Parker, and J. Folwell

Scull, had actual knowledge and constructive knowledge that Foglietta had previously sexually abused numerous minor boys at POLY PREP.

341.   Defendants POLY PREP and WILLIAMS negligently retained Foglietta with knowledge of Foglietta's propensity for the type of behavior which resulted in each Plaintiff's injuries in this action.

342.   Defendants POLY PREP and WILLIAMS negligently retained Foglietta in a position where he had access to children (such as each Plaintiff) and could foreseeably cause harm which each Plaintiff would not have been subjected to had Defendants POLY PREP and WILLIAMS taken reasonable care to protect children like each Plaintiff from known sexual predators.

343.   In failing to timely remove Foglietta from working with children or terminate the employment of Foglietta, Defendants POLY PREP and WILLIAMS failed to exercise the degree of care that a reasonably prudent person (or parent) would have exercised under similar circumstances.

344.   Defendant POLY PREP's conduct towards Plaintiff, and WILLIAMS's conduct towards Plaintiff, in connection with their negligent retention of Foglietta, constitutes gross negligence.

345.   At all material times, Defendants POLY PREP's and WILLIAMS's acts and failures to act created an unreasonable risk of harm to minor children, including each Plaintiff, because POLY PREP and WILLIAMS failed to exercise even slight care or diligence towards each Plaintiff and other similarly situated children—and constituted gross indifference to the rights of each Plaintiff and other similarly situated children, utter disregard of prudence, and a complete neglect of the safety of each Plaintiff and other similarly situated children.

346.    At all material times, Defendants, POLY PREP's and WILLIAMS's, conduct towards each Plaintiff was willful, wanton, intentional, and malicious, and constituted evil-minded acts accompanied by a wanton and willful disregard of each Plaintiff's rights, interests, and welfare.

347.    At all material times, Defendants, POLY PREP's and WILLIAMS's, conduct towards each Plaintiff was seriously harmful to the public, which has a compelling interest in ensuring that children in the community are protected from known sexual predators and other dangerous instrumentalities.

348.    Defendant POLY PREP's conduct, and Defendant WILLIAMS's conduct, towards each Plaintiff gives rise to punitive damages.

349.    As a direct and proximate result of the foregoing, each Plaintiff sustained physical, emotional and psychological injuries, along with pain and suffering.

***

350.    Each cause of action alleged herein (Count I, Violation of Title IX; Count II, Negligence/Gross Negligence; Count III, Negligent Supervision; and Count IV, Negligent Retention), is timely, pursuant to *The Child Victims Act* that was enacted into law on February 14, 2019 (and modified on or about August 3, 2020).

351.    Indeed, each Plaintiff alleges that Defendants committed intentional or negligent acts or omissions which resulted in the Plaintiffs suffering physical, psychological or other injuries or conditions as a direct and proximate result of conduct which constitutes a sexual offense committed against a child less than eighteen years of age, as defined in *Article 130 of the New York Penal Law*.

352.    This action, moreover, has been filed not earlier than six months after, and not later than

two years and six months after, the effective date of the newly added *New York CPLR § 214-g*

(February 14, 2019), as amended.

353.    It is hereby alleged pursuant to *CPLR § 1603* that the foregoing cause of action is exempt

from the operation of *CPLR § 1601* by reason of one or more of the exemptions provided in *CPLR*

*§ 1602*, including but not limited to *CPLR § 1602(7)*.

   **WHEREFORE**, based on the aforesaid, Plaintiffs, GRAY MONTAGUE, JONAH DOE,

JAKE DOE, JOSH DOE, and RON DOE, hereby demand judgment in their favor and against each

of the Defendants, jointly and severally, as follows:

1.    As and for Count I, ***Violation of Title IX*** (Against Defendant POLY PREP), compensatory

damages for each Plaintiff (in an amount greater than $75,000.00) in a sum to be determined at

trial, as well as reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and/or any other appropriate

authority;

2.    As and for Count II, ***Negligence/Gross Negligence*** (Against Defendants, POLY PREP,

WILLIAMS, and DUPEE), compensatory damages for each Plaintiff (in an amount greater than

$75,000.00) in a sum to be determined at trial, as well as punitive damages for each Plaintiff in a

sum to be determined at trial;

3.    As and for Count III, ***Negligent Supervision*** (Against Defendants, POLY PREP and

WILLIAMS), compensatory damages for each Plaintiff (in an amount greater than $75,000.00) in

a sum to be determined at trial, as well as punitive damages for each Plaintiff in a sum to be

determined at trial;

4.      As and for Count IV, ***Negligent Retention*** (Against Defendants, POLY PREP and WILLIAMS**),** compensatory damages for each Plaintiff (in an amount greater than $75,000.00) in a sum to be determined at trial, as well as punitive damages for each Plaintiff in a sum to be determined at trial;

5.      All appropriate prejudgment interest; all appropriate reasonable attorneys' fees; and any other, different, or further relief as this Honorable Court may deem just, proper, or necessary.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury of all issues so triable.


Dated:  July 19, 2021
             Orangeburg, New York                              Respectfully submitted,


**KEVIN T. MULHEARN, P.C.**                   **DARREN J. EPSTEIN, ESQ., P.C.**

*Kevin T. Mulhearn /S*                              *Darren J. Epstein /S*
_____      _____
KEVIN T. MULHEARN, ESQ. (KM 2301)       DARREN J. EPSTEIN, ESQ. (DJ0285)
60 Dutch Hill Road, Suite 6B                     254 South Main Street, Suite 406
Orangeburg, New York 10962                    New City, New York 10956
(845) 222-8092                                        (845) 634-6800
kmulhearn@ktmlaw.net                            darren@depsteinesq.com

***Attorneys for Plaintiffs, GRAY MONTAGUE,***
***JONAH DOE, JAKE DOE, JOSH DOE,  and RON DOE***