UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

GRAY MONTAGUE, JONAH DOE, JAKE DOE,
RON DOE, and JOSH DOE,

                    Plaintiffs,

            v.

WILLIAM M. WILLIAMS, RALPH DUPEE, and
POLY PREP COUNTRY DAY SCHOOL,

                   Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
21-CV-4054 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiffs Gray Montague, Jonah Doe, Jake Doe, Ron Doe, and Josh Doe commenced this

action on July 19, 2021 against Defendants William M. Williams, Ralph Dupee, and Poly Prep

Country Day School pursuant to the New York Child Victim Act ("CVA"), which created a two-

year revival window for previously time-barred childhood sexual abuse claims.  (Compl. ¶ 10,

Docket Entry No. 1; *see* N.Y. C.P.L.R. § 214-g.)  Plaintiffs alleged that from 1966 to 1991,

Defendants engaged in a conspiracy to conceal and cover up the sexual abuse of multiple male

students by Poly Prep's late football coach, Philip Foglietta  (Compl. ¶¶ 3–4.)  On March 14,

2022, Plaintiffs filed a corrected Amended Complaint, alleging claims of negligence, gross

negligence, willful misconduct, negligent supervision and training, negligent retention, and

negligent hiring.  (Am. Compl., Docket Entry No. 47.)

       Defendants move to dismiss the Amended Complaint on the grounds that the CVA is

unconstitutional under the due process clause of the New York state constitution, Plaintiffs'

claims are impermissibly duplicative, and that Plaintiffs failed to state a claim pursuant to Rule 12(b)(6).[1]  For the reasons explained below, the Court denies Defendants' motion to dismiss.

## I.   Background

The Court assumes the truth of the factual allegations in the Amended Complaint for the purpose of deciding Defendants' motion.

### a.   Football coach Philip Foglietta

Plaintiffs contend that in or about 1965 or 1966, Poly Prep hired Foglietta as a football coach, basketball coach, baseball coach and physical education instructor for students in the fifth grade through twelfth grade.  (Am. Compl. ¶ 32.)  From 1966 to 1991, Foglietta allegedly sexually abused more than a hundred boys from the ages of nine to seventeen years old, near or on the premises of Poly Prep.  (*Id.* ¶¶ 34–35.)  Foglietta became the head coach of the Poly Prep varsity football team and often recruited vulnerable boys to work as managers of the team where they would be required to spend considerable time alone with Foglietta  (*Id.* ¶¶ 36–37.) Plaintiffs contend that Foglietta used his access to and authority over the managers to sexually abuse many of them.  (*Id.* ¶ 38.)  Plaintiffs also contend that Foglietta sexually abused numerous minor boys during Poly Prep's Summer Day Camp at which Foglietta worked as a counselor. (*Id.* ¶¶ 41–42.)

---

[1]  (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 52; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 52-1; Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 53; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 55.)

### b.   Foglietta's alleged sexual abuse of Plaintiffs

#### i.   Montague

Plaintiffs contend that Foglietta sexually abused Montague more than twenty times from 1975–1979 by fondling his privates, performing oral sex on him, and committing anal rape.  (*Id.* ¶¶ 47–48.)  This abuse occurred on the grounds of Poly Prep including Foglietta's "cage" office in the bowels of the boys' locker room, the boys' locker room, the shower room, the gymnasium building, and in Foglietta's vehicle parked on or adjacent to Poly Prep.  (*Id.* ¶ 49.)  Foglietta also sexually abused Montague at his apartment in Bay Ridge. (*Id.* ¶ 50.)

Montague complained to Michael Novello, a high-ranking administrator at Poly Prep, (*id.* ¶¶ 25–27); Williams, the Headmaster of Poly Prep from 1970 to 2000 (*id.* ¶¶ 20–21); and Dupee, a teacher, coach, and high-ranking administrator at Poly Prep (*id.* ¶¶ 22–24), numerous times in or about 1976 to 1980.  (*Id.* ¶ 52.)  Each Poly Prep administrator responded to Montague's complaints with hostility and threatened to expel him.  (*Id.* ¶ 53.)

As a result of Foglietta's alleged sexual abuse, Montague suffered physical injuries and suffered and continues to suffer from severe emotional anguish and mental pain and suffering. (*Id.* ¶ 56.)  In or about 1976 or 1977, when in eighth grade, Montague first attempted to take his own life and then subsequently tried to commit suicide on two other occasions.  (*Id.* ¶¶ 57–58.) Montague has battled alcohol and drug addictions his entire life, committed crimes, battled severe depression and other mental health issues, struggled to maintain close and intimate personal relationships, and struggled to maintain and retain consistent employment as a result of Foglietta's sexual abuse.  (*Id.* ¶¶ 59–65.)

### ii.   Jonah Doe

Jonah Doe enrolled at Poly Prep on a work-study financial aid package and worked in some capacity with the football team by setting up game films.  (*Id.* ¶¶ 68–69.)  Jonah Doe became a manager of the football team at Foglietta's urging.  (*Id.* ¶ 71.)  Jonah Doe contends that Foglietta abused him more than 100 times from 1981 to 1985.  (*Id.* ¶¶ 71–74.)  The alleged sexual abuse occurred at various locations on the grounds of Poly Prep including Foglietta's cage office, the equipment room, and the coaches' locker room.  (*Id.* ¶ 77.)

In 1984, Poly Prep's Athletic Director, Harlow Parker, walked into the equipment room while Foglietta was sexually abusing Jonah Doe.  (*Id.* ¶ 79.)  Parker and Poly Prep allegedly took no action in response to Parker's direct observation.  (*Id.* ¶ 79.)  In addition, Plaintiffs contend that Poly Prep's Director of Physical Education, Edward Ruck, walked into the coaches' locker room and observed Foglietta showering with and inappropriately touching Jonah Doe and two other Poly Prep students; Poly Prep took no action in response to Ruck's observation.  (*Id.* ¶ 80.)

Jonah Doe contends that due to Foglietta's sexual abuse, Jonah Doe suffered physical injuries and suffered, and continues to suffer, from severe emotional anguish and mental pain and suffering.  (*Id.* ¶ 82.)  Jonah Doe also faced severe and crippling depression and considered suicide when Foglietta's alleged sexual abuse was publicized in New York tabloids in 2006.  (*Id.* ¶ 83.)  Due to the alleged abuse, Jonah Doe has battled alcohol and drug abuse, severe depression, low self-esteem, strained familial relationships, professional underperformance, and substantial expenses for therapy.  (*Id.* ¶¶ 84–90.)

### iii.   Jake Doe

Jake Doe attended Poly Prep on a work-study financial aid package and played football for all four years where he encountered Foglietta  (*Id.* ¶¶ 93–94.)  Foglietta massaged Jake Doe

regularly in the Poly Prep training room, but those massages turned into sexual abuse. (*Id.* ¶ 94.) Jake Doe encountered Foglietta on the basketball and baseball teams as well, and when Jake Doe struggled against Foglietta, Foglietta allegedly admonished him and told him, "this is what all professional athletes do," and "[t]his is normal." (*Id.* ¶ 95.) Jake Doe contends that Foglietta abused him twenty-five times from 1977 to 1979 on the grounds of Poly Prep including a large training room, a smaller training room, the squash courts, and the fieldhouse. (*Id.* ¶¶ 97, 101.)

In or about 1978, Poly Prep's equipment manager, "Willy," walked into the training room while Foglietta was allegedly sexually abusing Jake Doe but did not intervene. (*Id.* ¶ 103.) Foglietta's alleged sexual abuse of Jake Doe led to severe physical injuries and emotional anguish and mental pain and suffering that continues to this day. (*Id.* ¶ 105.) Jake Doe has battled severe depression and low self-esteem, has had difficulty maintaining close interpersonal relationships, and has underperformed scholastically and professionally. (*Id.* ¶¶ 106–110.)

### iv.  Josh Doe

Josh Doe played basketball during his freshman year and was coached by Foglietta and had Foglietta as a physical education teacher. (*Id.* ¶¶ 118–119.)  During one class, Foglietta allegedly placed his hand down Josh Doe's shorts. (*Id.*)  Foglietta often had other Poly Prep teachers and coaches pull Josh Doe out of class and direct him to visit Foglietta in his cage office where he would then be sexually abused. (*Id.* ¶ 120.)  Josh Doe contends that Foglietta sexually abused him more than 100 times from 1976 to 1979, including touching and fondling Josh Doe's genitals, and masturbating Josh Doe, which occurred at various locations on the grounds of Poly Prep including Foglietta's cage office, the squash courts, training room, and the wrestling room. (*Id.* ¶¶ 113–117.)

Josh Doe's grades at Poly Prep struggled as a result of Foglietta's alleged ongoing sexual

abuse and after his tenth grade year, Poly Prep expelled Josh Doe for deficient grades.  (*Id.* ¶¶ 121–124.)  As a result of the sexual abuse, Josh Doe suffered physical injuries and continues to suffer from emotional anguish and mental pain and suffering.  (*Id.* ¶ 126.)  Josh Doe has battled alcohol and drug dependency, severe depression, and low self-esteem as a result of Foglietta's alleged sexual abuse, (*id.* ¶¶ 127–128); has struggled to maintain close and intimate relationships and suffered the dissolution of his marriage due to an incident that triggered his traumatic childhood experiences,  (*id.* ¶¶ 129–133,); has difficulty maintaining employment, (*id.* ¶ 134,); and suffers from serious health problems, (*id.* ¶ 135).

### v.  Ron Doe

Ron Doe contends that Foglietta sexually abused him more than thirty times over a one-year period from 1975 to 1976, including touching and fondling his genitals and masturbating him.  (*Id.* ¶¶ 138, 140.)  He contends that Foglietta abused him on the grounds of Poly Prep including a room located across from the girls' locker room, the squash courts, training room, and the gymnasium.  (*Id.* ¶ 141.)  Ron Doe played on the basketball team and was coached by Foglietta and allegedly sexually abused by him until Ron Doe aggressively rebuffed Foglietta's attempt to sexually abuse him.  (*Id.* ¶¶ 143–144.)

Plaintiffs contend that, as a result of Foglietta's alleged abuse, Ron Doe has suffered from male anorgasmia his whole life which has caused substantial damage to every romantic or sexual relationship that he has ever had and has caused him extreme mental anguish, emotional distress, and mental pain and suffering.  (*Id.* ¶¶ 147, 151–153.)  Ron Doe suffered physical injuries and suffered and continues to suffer from severe emotional anguish and mental pain and suffering.  (*Id.* ¶ 148.)  In addition, Ron Doe has struggled with severe depression and anxiety, sleeping disorders, and alcohol and drug abuse.  (*Id.* ¶¶ 149–150.)  As a result of Foglietta's alleged

sexual abuse, Ron Doe has struggled to maintain close and intimate personal relationships with women and has struggled with sexual dysfunction throughout this entire life.  (*Id.* ¶¶ 151–153.)

### c.   Poly Prep administrators' knowledge of Foglietta's alleged sexual abuse

Plaintiffs contend that Poly Prep administrators and officials had actual and constructive notice of Foglietta's alleged sexual abuse of numerous minor boys at or near Poly Prep but condoned the behavior because Foglietta was a successful football coach and instrumental in raising substantial revenue for the school.  (*Id.* ¶¶ 154–155.)  Numerous individuals from 1966 to 1991 came forward to Poly Prep's administrators, officials, and/or faculty members and complained about Foglietta's alleged sexual abuse of children, including numerous Poly Prep students and their family members.  (*Id.* ¶ 156.)  In addition, "numerous Poly Prep administrators, officials, and faculty members personally observed Foglietta sexually abusing minor boys."  (*Id.* ¶ 157.)

William Jackson, a plaintiff in a related case against Poly Prep involving Foglietta's alleged sexual abuse, *Zimmerman v. Poly Prep Country Day School* ("*Zimmerman*"), 888 F. Supp. 2d 317 (E.D.N.Y. 2012), was allegedly sexually abused by Foglietta on multiple occasions in 1966.[2]  (*Id.* ¶¶ 161–163.)  Jackson notified his parents, David and Jean Jackson, who arranged for Jackson to tell his story of abuse to Poly Prep during a meeting with the then-Headmaster J. Folwell Scull and Athletic Director Parker.  (*Id.* ¶ 164.)  Poly Prep undertook action to conceal and cover up the sexual abuse by conducting a sham investigation, falsely notifying Jackson and his parents that they had completed a thorough investigation and concluded that Jackson's allegations were not credible, that Jackson was required to cease and desist from making allegations against Foglietta, and that Jackson would face severe consequences if he failed to do

---

[2]  The *Zimmerman* case settled in 2012.  (Defs.' Mem. 17–18.)

so.  (*Id.* ¶ 168.)  Foglietta allegedly continued to sexually abuse Jackson and Jackson complained

again, but was informed that his charges were not credible and he faced threatened expulsion.

(*Id.* ¶ 169.)

In 1970, when Williams became the new Poly Prep Headmaster, he was informed by the

previous Headmaster, Scull, and the Poly Prep Board of Trustees of the complaints made by

Jackson and others that Foglietta had sexually abused them and other students at Poly Prep.  (*Id.*

¶ 174.)  In or about May of 2002, Poly Prep was contacted by a lawyer for David Hiltbrand, a

former Poly Prep student and a plaintiff in the related case against Poly Prep, who had sent a

letter to Williams in February of 1991 stating that Foglietta allegedly sexually abused him when

he was a Poly Prep student in 1966.  (*Id.* ¶ 175.)  Williams discarded that letter, but another copy

was provided to Poly Prep.  (*Id.* ¶ 176.)

In May of 2022, Poly Prep's Board of Trustees directed Williams to draft a memorandum

which outlined his response to the Hiltbrand letter.  (*Id.* ¶ 177.)  Williams wrote in the first

memorandum: "The only awareness during the [twenty] years prior to 1991 came from an

unsigned letter from a parent accusing Coach Foglietta of molesting students.  I showed the letter

to him and he, of course, denied the allegation."  (*Id.* ¶ 178.)  However, in a second draft of the

letter, Williams stated: "The only reports I had received during my [twenty] years at Poly prior to

David's letter were two unsigned letters from parents (possibly the same one) who reported that

that [sic] children had been abused by Coach Foglietta  I showed one of the letters to Coach

Foglietta and he denied the accusation."  (*Id.* ¶ 182.)  Poly Prep was therefore aware that

Williams had received at least two letters that accused Foglietta of sexual misconduct.  (*Id.* ¶

183.)  In the early 1970s, Williams confronted Foglietta about a letter accusing him of sexual

abuse, and Foglietta threatened to file a defamation lawsuit if Poly Prep disseminated those

allegations.  (*Id.* ¶ 185.)  Around that same time, Williams received at least one phone call from a woman who accused Foglietta of doing "terrible things" to Poly Prep students.  (*Id.* ¶ 186.)

### d.   Foglietta's alleged propensity to interfere with his victims' educations

Plaintiffs contend that Foglietta often forced his victims to miss classes or pulled them out of classes they were attending to sexually abuse them.  (*Id.* ¶ 188.)  One or more of Foglietta's victims was contacted by Parker and/or Williams with respect to their unexcused absences from classes and failing grades.  (*Id.* ¶ 189.)  Foglietta then contacted Parker and/or Williams and told them to "stop harassing" his victims and both Parker and Williams acceded to Foglietta's demands.  (*Id.* ¶ 190.)

### e.   Other allegations

A number of other individuals, named and anonymous, alleged sexual abuse or knowledge of sexual abuse by Foglietta while at Poly Prep.

John Marino was on the Poly Prep football team and rebuffed Foglietta's attempts to sexually abuse him.  (*Id.* ¶ 193.)  He alleged that Foglietta frequently verbally abused and harassed him.  (*Id.* ¶ 194.)  On multiple occasions, Marino saw Foglietta sexually abusing boys on or near the Poly Prep grounds, (*id.* ¶ 195), and on one occasion, Marino's father also witnessed Foglietta sexually abusing a child, (*id.* ¶ 196).  In or about 1973, Marino and his parents met at Poly Prep with Williams and Parker to tell them that Foglietta was sexually abusing boys at Poly Prep, but Williams and Parker dismissed their concerns and threatened to expel Marino.  (*Id.* ¶¶ 197–200.)  In or about 1974, Marino's parents again met with Williams and Parker, but Williams and Parker denied the allegations again and threatened to expel Marino. (*Id.* ¶¶ 201–203.)

John Doe II, a plaintiff in the *Zimmerman* case, was sexually abused by Foglietta in the

boys' showers and Parker witnessed the abuse but took no action. (*Id.* ¶¶ 211–214.) In or about 1972 or 1973, John Doe II told a Poly Prep administrator, Robert Foreman, head of the lower school, that Foglietta was "grabbing" boys, but no action was taken in response. (*Id.* ¶ 215.) At some time in the mid-1970s, Williams was notified that Foreman too had inappropriately touched several boys. (*Id.* ¶ 216.) Williams paid Foreman for a year of not attending work and allowed his contract to expire without firing him or notifying anyone of the specific sexual misconduct complaints against Foreman. (*Id.* ¶ 217.)

John Doe III, while in Foglietta's apartment in 1971, opened a dresser drawer and saw that the drawer was filled with photographs of naked boys. (*Id.* ¶ 220.) Foglietta tried to take indecent photographs of John Doe III, as well. (*Id.* ¶ 222.)

Martin Weinstein attended Poly Prep Day Camp in or about the summer of 1972 and alleged that he was repeatedly sexually abused by Foglietta (*Id.* ¶ 223.) Weinstein directly notified Dupee, in his office at Poly Prep, that Foglietta had been "inappropriately touching him during camp," and that Foglietta was sexually abusing him. (*Id.* ¶¶ 224–225.) Dupee reacted angrily and told Weinstein to "keep his mouth shut," and did not take any further action. (*Id.* ¶¶ 226–227.)

PC-41 Doe, a plaintiff in a separate lawsuit in the Eastern District of New York against Poly Prep, Williams, and Novello, alleged that Foglietta abused him at Poly Prep from 1976 through 1983.[3] (*Id.* ¶ 228.) PC-41 Doe alleged in that complaint that he told a Poly Prep homeroom and music teacher about Foglietta's inappropriate conduct and was told his behavior would be looked into, but nothing came of it. (*Id.* ¶¶ 229–230.)

---

[3] The *PC-41 Doe* case is still active. *PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551 (E.D.N.Y. 2021).

J. Forest Vey worked as a shop teacher at Poly Prep in the 1970s and 1980s.  (*Id.* ¶ 231.)  Two of Vey's sons attended Poly Prep.  (*Id.*)  In December of 1976, Vey stormed into Williams' office at Poly Prep and confronted him about Foglietta's alleged sexual abuse of Poly Prep students.  (*Id.* ¶ 232.)  Vey told Williams to get rid of Foglietta, to which Williams replied, "I can't do that. My hands are tied."  (*Id.* ¶¶ 233–234.)

John Doe V, another plaintiff in the *Zimmerman* case, was allegedly sexually abused by Foglietta in or about 1974 at Poly Prep Day Camp.  (*Id.* ¶ 235.)  A Poly Prep faculty member entered the classroom where John Doe V was being abused and did not take any further action in response to the observation.  (*Id.* ¶ 236.)

In or about 1976 or 1977, Montague told Dupee that Foglietta was inappropriately touching him and making him "uncomfortable."  (*Id.* ¶¶ 237–238.)  Dupee replied that Montague was in trouble for that accusation and did not take any further action regarding Foglietta  (*Id.*)  In or about 1977 or 1978, Montague told Novello that "Foglietta was sexually abusing him during, shortly before, or shortly after, his team's athletic practices," (*id.* ¶ 240), but Novello told Montague that he would be expelled if he persisted in his allegations, (*id.* ¶¶ 241–242).  In or about 1979 or 1980, Montague told Williams that Foglietta had sexually abused him at Poly Prep, to which Williams reacted angrily and threatened to expel him and did not take any further action.  (*Id.* ¶¶ 245–247.)

In or about 1984, Parker witnessed Jonah Doe being sexually abused by Foglietta in the equipment room, but took no action to stop the assault, punish Foglietta, or protect Jonah Doe or other Poly Prep students.  (*Id.* ¶¶ 249–251.)  In addition, Ruck, Poly Prep's director of physical education, witnessed Foglietta showering with and inappropriately touching Jonah Doe and two other Poly Prep students but took no action in response.  (*Id.* ¶ 252.)

### f.   Poly Prep's coverup and spoilation of evidence

Plaintiffs contend that Poly Prep deliberately destroyed or discarded the following

documents:

> (1) the letters received in the early 1970s by Defendant Williams which accused Foglietta of sexual misconduct; (2) the original letter of David Hiltbrand, dated February 20, 1991, to Defendant Williams, which specifically and directly accused Foglietta of sexually abusing David Hiltbrand and other students; (3) a letter stuffed in various faculty mailboxes in 1990/1991, given to Defendant Williams by Sharyn Dolan (a POLY PREP faculty member), which directly accused Foglietta of sexually abusing students; and (4) all copies and/or the originals of the investigative notes of Peter T. Sheridan, Esq., an attorney hired by POLY PREP in 2002 to investigate, inter alia, the knowledge of POLY PREP's administrators and faculty as to Foglietta's sexual abuse of minor children and students at POLY PREP.

(*Id.* ¶ 253.)  In addition, Poly Prep, and/or its employees or agents, destroyed or discarded or

failed to generate or produce any documents regarding:

> (1) [Poly Prep's] investigation of, and/or response to, [Jackson's] 1966 allegations of sexual misconduct by Foglietta; (2) [Poly Prep's] investigation of, and/or response to, various letters and/or phone calls (received in the 1970s) which accused Foglietta of sexual misconduct and other inappropriate conduct; (3) [Poly Prep's] investigation of, and/or response to, . . . Marino's 1973 and 1974 allegations of sexual misconduct by Foglietta; (4) [Poly Prep's] investigation of, and/or response to, J. Forest Vey's accusations of sexual misconduct against Foglietta; (5) [Poly Prep's] investigation of, and/or response to, [Montague's] multiple sexual abuse allegations against Foglietta; (6) [Poly Prep's] investigation of, and/or response to . . . Parker's personal observances of Foglietta sexually abusing two [Poly Prep] students (in 1972 and 1984); (7) all minutes, audiotape or videotape recordings, or other documents created or generated by Poly Prep's Board of Trustees in 1991, when [Poly Prep] decided to terminate Foglietta's employment because of his sexual misconduct; (8) all minutes, audiotape or videotape recordings, or other documents created or generated by [Poly Prep's Board of Trustees] (or the Board of Trustees' Subcommittee on Sexual Misconduct) in 2002 during its so-called 'investigation' of allegations of sexual abuse by Foglietta; and (9) all documents created or generated by Peter Sheridan, Esq., Roderick MacLeish,

Esq., Jeffrey Newman, Esq., and/or Greenberg Traurig, LLP, in connection with their investigation or review of sexual abuse allegations at or concerning [Poly Prep], from 2002 to present.

(*Id.* ¶ 254.)

### g. Foglietta's leave from Poly Prep

In the *Zimmerman* case, various Poly Prep officials testified that in 1991, Poly Prep fired Foglietta based on the Hiltbrand letter in which Hiltbrand informed Williams that he had been sexually abused by Foglietta at Poly Prep in 1966. (*Id.* ¶ 255.) Williams did not respond to Hiltbrand's letter, and Hiltbrand left telephone messages which were never returned. (*Id.* ¶ 257.) Ultimately, Williams spoke to Hiltbrand on the phone but told him he did not reply to his letter because he had hurt his hand while skiing. (*Id.* ¶ 258.) In the *Zimmerman* case, Williams testified that after he received Hiltbrand's letter, he convened a meeting with Parker, Ruck, and other Poly Prep athletic department staff who attended the school in the early 1970s to ascertain if anyone knew anything about Foglietta's alleged sexual abuse. (*Id.* ¶ 259.) However, Plaintiffs allege that this group meeting never actually occurred, and that Williams and other Poly Prep officials manufactured this narrative to advance their defense in the *Zimmerman* case. (*Id.* ¶¶ 259–260.)

Plaintiffs contend that this testimony is demonstrably false because Parker had retired from Poly Prep in 1987 which was four years before the alleged meeting, and Ruck testified that (1) he had no recollection of any group meeting to discuss the Hiltbrand letter and (2) Williams never asked him whether he had any knowledge regarding Foglietta's sexual abuse. (*Id.* ¶ 261.) Plaintiffs further contend that Foglietta was not terminated until Foglietta allegedly repeatedly sexually abused a separate student in the Spring of 1991, and that student told numerous football coaches and his parents, and his parents threatened to publicly expose Foglietta and Poly Prep. (*Id.* ¶¶ 265–270.) Upon Foglietta's "retirement," Poly Prep celebrated Foglietta with a lavish

retirement dinner in New York City and Williams gave the invocation at the retirement celebration. (*Id.* ¶ 274.)

### h.  Consequences of Foglietta's alleged sexual abuse

At least five former Poly Prep students who attended Poly Prep in the 1970s and/or 1980s and were allegedly sexually abused by Foglietta committed suicide. (*Id.* ¶ 280.)  All of the Plaintiffs in this action seriously entertained thoughts of suicide at various times. (*Id.* ¶ 281.)  In or about 1977 or 1978, when Montague was in eighth grade and after he had been allegedly raped by Foglietta, he attempted to hang himself in his bathroom in his home and attempted to commit suicide two other times in his life. (*Id.* ¶¶ 283–284.)  In or about 2006, when New York tabloids ran stories on Foglietta's sexual abuse, Jonah Doe fell into a severe depression and seriously contemplated suicide. (*Id.* ¶ 282.)

### i.  Procedural background

Plaintiffs commenced this action on July 19, 2021 against Defendants pursuant to the CVA, which created a two-year revival window for previously time-barred childhood sexual abuse claims. (Compl. ¶ 1; *see* N.Y. C.P.L.R. § 214-g.)  Plaintiffs alleged that from 1966 to 1991, Defendants engaged in a conspiracy to conceal and cover up the sexual abuse of multiple male students by Foglietta (*Id.* ¶¶ 3–4.)  On March 14, 2022, Plaintiffs filed a corrected Amended Complaint alleging claims of negligence, gross negligence, willful misconduct, negligent supervision and training, negligent retention, and negligent hiring. (Am. Compl.)

Defendants move to dismiss the Amended Complaint on the grounds that: (1) the CVA is unconstitutional under the due process clause of the New York state constitution; (2) Plaintiffs' claims are impermissibly duplicative; and (3) Plaintiffs failed to state a claim pursuant to Rule

12(b)(6).[4]  (*See* Defs.' Mem.)

## II.   Discussion

### a.   Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (same).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Vaughn*, 957 F.3d at 145 (quoting *Iqbal*, 556 U.S. at 678).

### b.   The CVA's revival provision is constitutional under the due process clause of the New York state constitution

Defendants argue that the CVA's revival provision is unconstitutional for several reasons. First, Defendants argue that New York's due process protections are older and stricter than their

---

[4] Defendants also initially argued that the anonymous Plaintiffs' claims should be dismissed pursuant to Federal Rules of Civil Procedure 10(a) because they failed to seek leave of the Court to proceed under pseudonyms. (Defs.' Mem. 22–23.)  Defendants have since agreed that the Doe Plaintiffs may proceed anonymously.  (Defs.' Reply 1 n.1.)

federal counterparts because they predate the founding of the United States and provide vital protections to defendants who have the right to know what claims might be brought against them.  (Defs.' Mem. 6–8.)    Second, Defendants argue that New York courts require a revival statute to "remedy an injustice" which involves remedying a circumstance that made timeliness physically impossible in the first place.  (*Id.* at 8–11.)  In support, Defendants argue that whenever New York courts have held that a claim revival statute is constitutional, each of those cases involved a situation where individuals were faced "with a total and complete, practical inability to bring their claims during the allotted time."  (*Id.* at 9.)  Further, Defendants argue that the New York Court of Appeals has already determined that claims in connection with allegations of sexual abuse that arose when individuals were minors could have been brought in a timely manner.  (*Id.* at 11–13.)  Third, Defendants argue that recent, non-binding federal district court decisions upholding the CVA were wrongly decided.  (*Id.* at 13–16.)  In support, they argue that these cases "contained cursory reasoning," "did not engage with key precedent," and "wrongly deferred to the legislature rather than conducting judicial review of the CVA's constitutionality."  (*Id.* at 13–14.)  Lastly, Defendants argue that the CVA is not a "reasonable response to remedy an injustice" because it is unfair to Defendants.  (*Id.* at 17–18.)  Specifically, they argue that there is a strong public policy favoring statute of limitations which gives defendants a fair opportunity to defend claims against them before their ability to do so has deteriorated and because the CVA resurrects claims, "some decades old, where documents and witnesses are long gone making defense impossible," it is not a reasonable response to remedy an injustice.  (*Id.*)

Plaintiffs argue that the CVA is constitutional under New York law.  First, Plaintiffs argue that "in nearly 100 years, the Court of Appeals has *never* struck down a claim-revival

statute." (Pls.' Opp'n 9–10, 14–19.) In support, they argue that the Court of Appeals has stated the correct rule for evaluating claim-revival statutes is "deferential to the [l]egislature" and only requires that the statute "was enacted as a reasonable response in order to remedy an injustice." (*Id.* at 10 (citation omitted).) Specifically, Plaintiffs argue that the CVA was only a "one-year revival of claims for child sexual abuse" so it "easily passes constitutional muster." (*Id.*) Second, Plaintiffs argue that the legislative history accompanying the passage of the CVA indicates that the victims who could have brought such claims did not have the ability to do so because of "psychological scars" which "disabled them from suing until well into their adult years." (*Id.* at 10–12.) Third, Plaintiffs argue that the New York Court of Appeals in *Zumpano v. Quinn*, 6 N.Y.3d 666 (2006), called for the New York legislature to pass a claim revival statute. (*Id.* at 12.) In support, Plaintiffs point to language from *Zumpano* stating that "[a]ny exception to be made to allow these types of claims to proceed outside of the applicable statutes of limitations would be for the Legislature," and also cite to a footnote where the Court of Appeals cited approvingly to other states' claim revival statutes regarding sexual abuse victims. (*Id.* at 12–13.) Fourth, Plaintiffs argue that the case Defendants rely on, *Matter of World Trade Center Lower Manhattan Disaster Site Litigation*, 30 N.Y.3d 377 (2017), to support their argument that the Court of Appeals only upholds claim-revival statutes for claims that were physically impossible to bring in the first place, was vacated and its reasoning explicitly rejected by the Court of Appeals. (*Id.* at 14.) Specifically, the Court of Appeals, upon a question certified from the Second Circuit, determined that the correct standard for a claim-revival statute is far more permissive and deferential than what Defendants argue: "a reasonable response to remedy an injustice." (*Id.* at 19.) Fifth, Plaintiffs argue that New York state and federal courts have consistently upheld the New York CVA as constitutional. (*Id.* at 19–23.) In support,

Plaintiffs cite to cases upholding the CVA as constitutional, including *PC-41 Doe v. Poly Prep Country Day School*, 590 F. Supp. 3d 551 (E.D.N.Y. 2021), *appeal dismissed,* No. 21-CV-2669, 2022 WL 14807756 (2d Cir. May 3, 2022), in which a judge in this district permitted similar claims, brought under the CVA and against Poly Prep, to proceed past the motion to dismiss stage.  (*Id.* at 20–21.)  Lastly, Plaintiffs argue that Defendants' argument that revival of Plaintiffs' claims is unfair and prejudicial is baseless because there is nothing unfair or prejudicial in allowing Plaintiffs to finally be able to prosecute legal claims against Defendants given Defendants' decades-long misconduct.  (*Id.* at 23–24.)

"[A] claim-revival statute will satisfy the Due Process Clause of the [New York] State Constitution if it was enacted as a reasonable response in order to remedy an injustice."  *In re World Trade Ctr.*, 30 N.Y.3d at 400; *see also Carroll v. Trump*, No. 22-CV-10016, 2023 WL 185507, at *9 n.40 (S.D.N.Y. Jan. 13, 2023) (same); *Giuffre v. Andrew*, 579 F. Supp. 3d 429, 453 (S.D.N.Y. 2022) (same); *Farrell v. U.S. Olympic & Paralympic Comm.*, 567 F. Supp. 3d 378, 391 (N.D.N.Y. 2021) (same); *PC-41 Doe*, 590 F. Supp. 3d at 558 (same).

The Legislative Memorandum accompanying the CVA bill, justifies passage for the Act as follows:

> New York is one of the worst states in the nation for survivors of child sexual abuse. New York currently requires most survivors to file civil actions or criminal charges against their abusers by the age of 23 at most, long before most survivors report or come to terms with their abuse, which has been estimated to be as high as 52 years old on average. Because of these restrictive statutes of limitations, thousands of survivors are unable to sue or press charges against their abusers, who remain hidden from law enforcement and pose a persistent threat to public safety. This legislation would open the doors of justice to the thousands of survivors of child sexual abuse in New York State by prospectively extending the statute of limitations . . . .  Passage of the Child Victims Act will finally allow justice for past and future survivors of child sexual abuse, help the public identify hidden child predators through civil litigation

> discovery, and shift the significant and lasting costs of child sexual
> abuse to the responsible parties.

Legis. Mem. ("CVA Sponsor's Mem."), 2019, N.Y. Sess. Laws (Advance Sheets A-39)

(McKinney).

Although the Second Circuit has yet to opine on the constitutionality of the CVA, every

federal and state court to consider the issue has found it constitutional. *See, e.g., Andrew*, 579 F.

Supp. 3d at 453 ("Defendant is not the first litigant to advance this argument [that the CVA is

unconstitutional], which has been rejected by every New York state and federal court to have

encountered it.  And it has been rejected repeatedly for good reason."); *Farrell*, 567 F. Supp. 3d

at 393 ("[T]he Court finds that the CVA is a constitutional revival statute designed to remedy an

injustice; and, consequently, it does not violate either the New York or federal Due Process

Clauses."); *PC-41 Doe*, 590 F. Supp. 3d at 558 ("[T]he CVA, which afforded victims of

childhood sexual abuse a limited period of time within which to pursue their claims of sexual

abuse through the judicial system, was a reasonable, non-arbitrary response to remedy an

injustice and therefore satisfies the New York Due Process Clause."); *Giuffre v. Dershowitz*, No.

19-CV-3377, 2020 WL 2123214, at *2–3 (S.D.N.Y. Apr. 8, 2020) (dismissing the argument that

the CVA is unconstitutional under New York or federal law); *PB-36 Doe v. Niagara Falls City

Sch. Dist.*,152 N.Y.S.3d 242, 248 (N.Y. Sup. Ct. 2021), *aff'd*, 182 N.Y.S.3d 850 (N.Y. App. Div.

2023); *ARK3 Doe v. Diocese of Rockville Ctr.*, No. 900010/2019, 2020 N.Y. Misc. LEXIS 1964,

*15 (N.Y. Sup. Ct. May 11, 2020) (finding that "the [CVA] is a reasonable response to remedy

the injustice of past child sexual abuse" and "does not violate [the defendant's] right to due

process under the New York State Constitution"); *Torrey v. Portville Cent. Sch.*, 125 N.Y.S.3d

531 (N.Y. Sup. Ct. 2020) ("[T]he Court finds the [CVA] a reasonable response to remedy an

injustice. As such, it does not violate [the defendant's] right to due process under the New York

State Constitution.").

In *Andrew*, the court found that "New York's modest two-year revival window was a reasonable measure for remedying injustice to victims without treading upon the state Constitution's Due Process Clause." 579 F. Supp. 3d at 454. The court stated that regardless of "[w]hatever the historical practice" in New York regarding claim revival may have been, the New York Court of Appeals recently "made clear that the test for whether a claim-revival statute runs afoul of the New York Due Process Clause is simply whether the revival statute is 'a reasonable measure to address an injustice.'" *Id.* at 453 (quoting *In re World Trade Ctr.*, 30 N.Y.3d at 400). The court found that "[t]he CVA's limited claim-revival window was a reasonable measure to address an injustice and well within bounds of the new legal standard articulated shortly before its passage." *Id.* In doing so, the court specifically rejected the defendant's argument that New York "precedent ma[de] clear that claim revival is permitted *only* when there is an injustice of a type that makes a plaintiff *legally unable to sue*," *id.* (emphasis in original), because in light of recent Court of Appeals case law, "New York Courts' historical skepticism of claim-revival provisions appears to be just that; historical," *id.* (quoting *Dershowitz*, 2020 WL 2123214, at *2). In addition, the court found that "a range of legislative judgments undergird the provision's patent constitutionality," including "New York's comparatively restrictive limitations period for sexual abuse claims, improved understanding of victims' barriers to coming forward with those claims, and the imminent threat that abusers pose to public safety." *Id.* at 454. The court also considered the defendant's argument that the CVA was a not a reasonable measure because the legislature "hastily passed legislation to amend the CVA by doubling the claim-revival period from one year to two." *Id.* The court found that "New York's modest two-year revival window was a reasonable measure for remedying injustice

to victims without treading upon the state Constitution's Due Process Clause" because other states "have opened revival windows that were two years or longer from their inception, some of which were later extended for additional multiyear periods" and "[o]ther jurisdictions have enacted indefinite claim-revival windows." *Id.* The court concluded "[i]t is difficult to imagine substantially narrower measures capable of addressing the injustices animating the CVA" than "the measures . . . selected by the New York Legislature." *Id.* at 455.

In *PC-401 Doe*, the court considered a similar claim under the CVA against Poly Prep, Williams, and Novello regarding Foglietta's sexual abuse. *PC-41 Doe*, 590 F. Supp. 3d at 555. In concluding that the CVA is constitutional, the court rejected many of the arguments Defendants now advance to this Court. Specifically, the court rejected the argument that the CVA is not a "reasonable response" because claim revival statutes are only constitutional if they covered a plaintiff that had "a total and practical inability to bring a timely claim." *Id.* at 559 (internal quotation omitted). In addition, the court rejected the argument that the "CVA is unreasonable because it reopened claims from long ago that may be difficult to defend," because that concern applies to any expired claim that could potentially be revived and such claims have been found constitutional under New York law. *Id.* at 564.

In *Farrell*, the court rejected an argument that the CVA is unconstitutional because it does not pass New York's "stringent" test for claim revival and violated the defendant's due process rights. *Farrell*, 567 F. Supp. 3d at 391. The court relied on the reasoning in *PC-41 Doe* and *Dershowitz*. *Id.* at 392–93 ("Accordingly, relying on the same reasons as those on which New York courts and the courts in *PC-41 Doe* and [*Dershowitz*] relied, the Court finds that the CVA is a constitutional revival statute designed to remedy an injustice; and, consequently, it does not violate either the New York or federal Due Process Clauses."). The court also

concluded that due process arguments such as "defendants do not have information regarding prior reports of abuse, that witnesses may have died, and that memories may be impaired" are "speculative and unsupported by personal knowledge." *Id.* at 393.

The Court agrees with the other federal courts and New York state courts to consider the constitutionality of the CVA — under New York state law, the CVA is a "reasonable response to remedy an injustice" and therefore it passes muster under the New York Constitution's due process clause. *In re World Trade Ctr.*, 30 N.Y.3d at 400; *Sutton v. Marie*, No. 21-CV-6787, 2022 WL 3904100, at *3 (S.D.N.Y. Aug. 30, 2022) ("The CVA revives claims 'which would constitute a sexual offense' as defined in the 'penal law' under either Section 255.27, 255.26 or 255.25 or 263.05. N.Y. C.P.L.R. § 214-g."). As stated by the Sponsor's Memorandum in support of the CVA: "This legislation would open the doors of justice to the thousands of survivors of child sexual abuse in New York State by prospectively extending the statute of limitations . . . ." (CVA Sponsor's Memorandum at A-39.) In addition, the legislature's enactment was a "reasonable response" to the injustice because it "provides a means by which victims of childhood sexual abuse can pursue their claims through the judicial system, and there is no indication that the CVA is an arbitrary remedy." *PC-41 Doe*, 590 F. Supp. 3d at 563. Furthermore, the CVA only revived claims for a one-year period (extended to two years in response to the COVID-19 pandemic) and one-year claim revival statutes have been condoned by the Court of Appeals. *See id.* at 564 (citing cases); *see also, e.g.*, *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487 (1989); *Gallewski v. Hentz & Co.*, 301 N.Y. 164, 172–75 (1950); *Robinson v. Robins Dry Dock & Repair Co.*, 238 N.Y. 271, 276–80 (1924).

Defendants' arguments to the contrary are unavailing or persuasive. First, the Court of Appeals has not held that claim revival statutes are only constitutional if timeliness of the initial

22

claim was "physically impossible." (Defs.' Mem. 8.)  In fact, the Court of Appeals has rejected a "more heightened standard" because it "would be too strict," *In re World Trade Ctr.*, 30 N.Y.3d at 400, and instead has held that a claim revival statute will satisfy the due process clause if it was "enacted as a reasonable response in order to remedy an injustice." *Id.*  Defendants' argument that the Court of Appeals in *Zumpano* determined these claims could have been brought in a timely manner fails for the same reason.  (Defs.' Mem. 11–12.)  In *Zumpano*, a case predating the CVA, the Court of Appeals rejected the plaintiffs' argument that they should be permitted to bring claims with allegations of child sexual abuse because they were time-barred. *Zumpano*, 6 N.Y.3d at 673.  The Court of Appeals noted that plaintiffs could have brought their claims in a timely manner.  *Id.*  However, *Zumpano* did not address the CVA because it predated it, and the Court of Appeals made clear that the legislature could revive the claims it was dismissing.  *Id.* at 677 ("However reprehensible the conduct alleged, these actions are subject to the time limits created by the Legislature. Any exception to be made to allow these types of claims to proceed outside of the applicable statutes of limitations would be for the Legislature, as other states have done."); *see also Carroll*, 2023 WL 185507, at *9 n.40 ("*World Trade Ctr.* left the determination of the existence of the necessary injustice at least substantially, and perhaps entirely, to the judgment of the elected branches of government.").[5]

The Court concludes that the CVA's revival provision is constitutional under the due process clause of the New York constitution and therefore denies Defendants' motion to dismiss on that ground.

---

[5]  Defendants' reliance on *Regina Metro Co., LLC v. New York State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332 (2020) is also misplaced.  (Defs.' Mem. 14–15.)  Although the Court of Appeals in *Regina* warned against the dangers of retroactive application of legislation, *Regina* did not involve a claim-revival statute and is therefore inapposite to the case before the Court.

### c.   Plaintiff's claims are not duplicative

Defendants argue that Plaintiffs' tort claims fail because they are impermissibly duplicative.  (Defs.' Mem. 21–22.)  In support, Defendants argue that Plaintiffs' claims for willful misconduct, negligent supervision and training, negligent retention, and negligent hiring are based on the same factual allegations and seek the same relief as Plaintiffs' claims for general negligence and gross negligence.  (*Id.*)  Defendants argue that these claims are based on the same set of facts and theory that "Poly Prep was allegedly negligent in its supervision and retention of Foglietta."  (*Id.* at 22.)

Plaintiffs argue that the claims are not impermissibly duplicative because Plaintiffs are entitled to plead alternative theories of negligence especially where the elements of the claims differ.  (Pls.' Opp'n 24–29.)  In support, Plaintiffs argue that their claims for negligent training and supervision, negligent retention, and negligent hiring are not impermissibly duplicative of their claims for general negligence and gross negligence because (1) in *PC-41 Doe*, the court permitted claims for negligent hiring, retention, supervision, negligence, gross negligence, and willful misconduct to proceed while dismissing other claims for being duplicative; and (2) New York state courts have sustained independent causes of action for such claims.  (*Id.*)  In addition, Plaintiffs argue their claim for willful misconduct is not impermissibly duplicative of their cause of action for negligence or gross negligence because the claims have different elements.  (*Id.* at 29–31.)  Plaintiffs argue that gross negligence requires "a devil-may-care attitude or indifference to duty amounting to recklessness," while willful misconduct involves "a conscious indifference or I don't care attitude which is the prerequisite of wanton behavior."  (*Id.* at 30 (quoting *PC-41 Doe*, 590 F. Supp. 3d at 568).)

The Second Circuit has stated that "[t]wo claims are duplicative of one another if they

24

'arise from the same facts and do not allege distinct damages.'" *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (quoting *Sitar v. Sitar*, 854 N.Y.S.2d 536, 538 (App. Div. 2008)); *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) ("Under New York law, claims are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'" (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 49–50 (App. Div. 2010))); *Alan L. Frank Law Assocs. v. OOO RM Inv.*, No. 17-CV-1338, 2020 WL 7022317, at *18 (E.D.N.Y. Nov. 30, 2020) ("'[I]t is not the theory behind a claim that determines whether it is duplicative,' but rather the conduct alleged and the relief sought." (quoting *MIG, Inc. v. Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P.*, 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010)).

To establish a prima facie case of negligence under New York law, "a plaintiff must prove (1) that the defendant owed her a duty; (2) that the defendant breached that duty; and (3) that she suffered injuries proximately resulting from that breach.'" *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (quoting *Solomon ex rel. Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)).  Gross negligence requires an additional allegation of "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing," specifically an allegation of "a devil-may-care attitude or indifference to duty amounting to recklessness."  *PC-41 Doe*, 590 F. Supp. 3d at 568 (quoting *Taylor Precision Prod., Inc. v. Larimer Grp., Inc.*, No. 15-CV-4428, 2018 WL 4278286, at *18 (S.D.N.Y. Mar. 26, 2018)).

Although the negligent training and supervision, negligent retention, and negligent hiring claims contain overlapping elements with a negligence claim, they also require slightly different facts to be pleaded to make out each claim.  A claim for negligent training and supervision requires that (1) "[a] person not a parent who undertakes a duty to care for or supervise a child is

required to use reasonable care to protect the child from harm," and (2) "may be liable for injury proximately caused by his or her negligence in doing so." *Mary Anne "ZZ" v. Blasen*, 726 N.Y.S.2d 767, 775 (App. Div. 2001). This differs from the elements for a general or gross negligence claim because a negligent supervision claim is specifically about caring for a child and protecting a child from harm.

A claim for negligent retention requires (1) "allegations that the defendant knew or should have known of its employee's propensity to engage in the conduct that caused the plaintiff's injuries," and (2) "that the alleged negligent supervision or retention was a proximate cause of those injuries." *Gray v. Schenectady City Sch. Dist.*, 927 N.Y.S.2d 442, 445 (App. Div. 2011); s*ee also Gonzalez v. City of New York*, 17 N.Y.S.3d 12, 16 (App. Div. 2015) ("[W]hen the retention of an officer may involve a risk of bodily harm to others, the government has a duty to abate the risk of dangers to others."). This differs from the elements required to prove a claim of general or gross negligence because a claim of negligent retention requires a plaintiff to allege that the defendant knew of the employee's propensity to engage in harmful conduct and the insufficient supervision or training caused harm. Unlike a claim for general or gross negligence, a plaintiff need not prove that a defendant owed them a duty of care.

Finally, a claim of negligent hiring requires (1) "allegations that an employer knew of its employee's harmful propensities," (2) "that it failed to take necessary action," and (3) "that this failure caused damage to others." *Waterbury v. New York City Ballet, Inc.*, 168 N.Y.S.3d 417, 423 (App. Div. 2022); *see also Zanghi v. Laborers' Int'l Union of N. Am., AFL-CIO*, 778 N.Y.S.2d 607, 608 (App. Div. 2004) ("Those defendants may be held liable for the conduct of [their employee] only if they knew or should have known of [the employee's] alleged violent propensities. Furthermore, the propensities must be for the type of behavior that caused plaintiff's

harm." (citation omitted)).  This differs from the elements required to prove a claim of general or gross negligence because plaintiff need not prove that defendants owed them a duty of care, and this claim is specific to the employer-employee context.  Unlike gross negligence, plaintiff need not show that defendant was "reckless."  *PC-41 Doe*, 590 F. Supp. 3d at 568.

Because the various claims require different theories of negligence and different facts to be pleaded in order to state a claim, they are not duplicative of each other.[6]  In similar cases arising pursuant to claims under the CVA, various federal and state courts have permitted multiple negligence claims with different facts and theories to proceed past the motion to dismiss stage.  *See, e.g.*, *PC-41 Doe*, 590 F. Supp. 3d at 570 (while sustaining claims for negligent hiring, negligent retention, negligent supervision, negligence, gross negligence, and willful misconduct, the court dismissed plaintiff's claims for negligent infliction of emotional distress, premises liability, and breach of duty in loco parentis as "duplicative" of those cognizable negligence claims); *C.Q. v. Est. of Rockefeller*, No. 20-CV-2205, 2021 WL 4942802, at *4 (S.D.N.Y. Oct. 21, 2021) (in a CVA case, the court dismissed premises liability claim as "duplicative" but ruled that plaintiff's claims for negligence, gross negligence, negligent retention, and negligent supervision, all survived defendants' motion to dismiss); *Fay v. Troy City Sch. Dist.*, 151 N.Y.S.3d 642, 642 (App. Div. 2021) (in a CVA case, the court dismissed premises liability and negligent infliction of emotional distress claims as "duplicative" of negligence claims but sustained separate causes of action for negligence, negligent supervision, and negligent retention); *Wilczynski v. Gates Cmty. Chapel of Rochester, Inc.*, No. 20-CV-06616, 2022 WL

---

[6]  Defendants cite to a number of cases with similar facts dismissing claims for premises liability, breach of duty *in loco parentis*, and negligent infliction of emotional distress as duplicative of negligence and gross negligence claims.  (Defs.' Mem. 21–22.)  However, in the Amended Complaint, Plaintiffs avoid pleading those claims which courts have found to be duplicative.

446561, at *3 (W.D.N.Y. Feb. 14, 2022) (in a CVA case, the court determined that the plaintiff's claims for negligence, negligent hiring, negligent supervision and training, and negligent retention were adequately pled and survived motion to dismiss, while dismissing plaintiff's negligent infliction of emotional distress claims as duplicative of plaintiff's surviving negligence claims); *Digiorgio v. Roman Catholic Diocese of Brooklyn*, 2021 N.Y. Misc. LEXIS 1978, *18-20 (Sup. Ct. 2021) (claims for negligence, gross negligence, negligent retention, and negligent supervision all survived defendant's motion to dismiss); *Torrey*, 125 N.Y.S.3d 531 (Sup. Ct. 2020) (the court sustained causes of action against defendant school district for negligent hiring, retention, supervision, and direction, as well as negligence and gross negligence).[7]

Accordingly, the Court finds that Plaintiffs' tort claims are not duplicative.

### d. Plaintiffs sufficiently plead a negligent hiring claim

Defendants argue that Plaintiffs' negligent hiring claim fails to state a claim because Plaintiffs do not allege any facts regarding "any notice by Poly Prep, prior to hiring Foglietta in 1966, of a propensity by Foglietta to commit acts of sexual abuse." (Defs.' Mem. 19–21.) In support, Defendants argue that Plaintiffs do not allege any facts that Poly Prep had awareness or should have had awareness of Foglietta's propensity to commit sexual abuse. (*Id.* at 20.) In addition, Defendants argue that to the extent that Plaintiff's negligent hiring claim is based on "rehiring" Foglietta when his annual contract expired, that claim must fail because by definition, the tort of negligent hiring only pertains to prospective employees, not existing employees. (*Id.*)

Plaintiffs argue that a rehiring theory of negligent hiring is plausible even where a

---

[7] Defendants also argue that reliance on *PC-41 Doe* is misguided because in that case the plaintiff pled a single cause of action of "negligent hiring, retention, supervision." 590 F. Supp. 3d at 565–66. This argument is unavailing because the court in *PC-41 Doe* concluded that where the plaintiffs pled various claims in a single count, it understood the plaintiffs to be alleging in this Count three *separate* but largely overlapping torts." *Id.* at 568 (emphasis added).

plaintiff does not allege that the defendants had prior knowledge of an individual's propensity to cause harm.  (Pls.' Opp'n 31–32.)  In support, Plaintiffs argue that Foglietta was a contract employee of Poly Prep and needed to be rehired periodically, Poly Prep did rehire Foglietta periodically from 1966 through 1991, and that at least some of those decisions to rehire Foglietta occurred after school administrators received actual notice that Foglietta had a propensity to sexually abuse minor boys and had previously done so.  (*Id.* at 32; Am. Compl. ¶ 374.)

"[A] negligent hiring claim can lie when an employer rehires an employee."  *PC-41 Doe*, 590 F. Supp. 3d at 567; *see also Kirk v. Metro. Transp. Auth.*, No. 99-CV-3787, 2001 WL 258605, at *12 (S.D.N.Y. Mar. 14, 2001) (finding a genuine issue of material fact as to negligent hiring where plaintiff provided evidence that defendant corporation "rehir[ed] [employee] after new evaluations revealed the same propensities" that led to him being fired); *Detone v. Bullit Courier Serv., Inc.*, 528 N.Y.S.2d 575, 576–78 (App. Div. 1988) (evaluating a negligent hiring claim where an employee had been fired and rehired).

Because a negligent hiring claim is permissible on a theory of negligent rehiring, Plaintiffs have stated a claim for negligent hiring.  Accordingly, the Court denies Defendants' motion to dismiss on this ground.

### III.  Conclusion

For the foregoing reasons, the Court denies Defendants' motion to dismiss.

Dated:  March 30, 2023
Brooklyn, New York

SO ORDERED:


___/s/ MKB_____
MARGO K. BRODIE
United States District Judge